# Exhibit F



# U.S. Federal Housing FHFA

Constitution Center
400 7th Street, S.W.
Washington, D.C. 20219
Telephone: (202) 649-3800
Facsimile: (202) 649-1071
www.fhfa.gov

April 14, 2025

The Honorable Pamela J. Bondi
The Honorable Todd Blanche
Department of Justice
950 Pennsylvania Avenue, NW
Washington, D.C. 20530

RE:    **CRIMINAL REFERRAL**

Dear Attorney General Bondi and Deputy Attorney General Todd Blanche:

Pursuant to my authority as Director of the U.S. Federal Housing Finance Agency ("U.S. Federal Housing" or "FHFA"), I am referring the matter below. As regulator of Fannie Mae, Freddie Mac, and the Federal Home Loan Banks, we take very seriously allegations of mortgage fraud or other criminal activity. Such misconduct jeopardizes the safety and soundness of FHFA's regulated entities and the security and stability of the U.S. mortgage market.

In the course of exercising U.S. Federal Housing's authorities under the Federal Housing Enterprises Financial Safety and Soundness Act of 1992, U.S. Federal Housing has identified matters that are appropriate for referral to the U.S. Department of Justice for consideration of criminal prosecution.

Based on media reports, Ms. Letitia James has, in multiple instances, falsified bank documents and property records to acquire government backed assistance and loans and more favorable loan terms. This has potentially included 1) falsifying residence status for a Norfolk, Virginia-based home in order to secure a lower mortgage rate and 2) misrepresenting property descriptions to meet stringent requirements for government backed loans and government assistance.

**Background:**

<u>██ *Sterling Street, Norfolk, VA 23505*</u>

On August 17, 2023, Ms. James granted Ms. Shamice Thompson-Hairston power of attorney to make a Virginia property her "principal residence." **See Exhibit A**. And on August 30 and 31, 2023, through her attorney, Ms. James purchased this property in Norfolk, VA. In a Fannie Mae/Freddie Mac Form 3047 and in mortgage documents, she reaffirmed this would be her primary residence, despite being a statewide public office holder in the state of New York at that same time and primarily residing in the state of New York. **See Exhibit B.**

1

In fact, a building permit issued on her New York property on July 15, 2024 lists her New York property as the "JAMES RESIDENCE" and states "Remain Occupied":

```
26  Owner's Information
            Name: LETITIA JAMES
    Relationship to Owner: SELF
         Business Name: JAMES RESIDENCE              Business Phone:
         Business Address:                            Business Fax:
                E-Mail:                               Owner Type: INDIVIDUAL
             Non Profit:  ☐ Yes   ☒ No

    Yes  No
     Y   ☐   Owner's Certification Regarding Occupied Housing (Remain Occupied)
     ☐   N   Owner's Certification Regarding Occupied Housing (Rent Control / Stabilization)
     ☐   ☐   Owner DHCR Notification
     ☐   ☐   Owner's Certification for Adult Establishment
     ☐   ☐   Owner's Certification for Directive 14 (if applicable)
```

Primary residence mortgages receive more favorable loan terms, including lower interest rates, than secondary residence mortgages. Lenders view secondary residence mortgages as significantly riskier, as a borrower is more likely to continue paying off a primary residence mortgage during any financial hardship. Interest rates on secondary residence mortgages are typically between 0.25-0.50% higher than their primary residence counterparts; however, this gap can widen depending on the lender. At the time of the 2023 Norfolk, VA property purchase and mortgage, Ms. James was the siting Attorney General of New York and is required by law to have her primary residence in the state of New York—even though her mortgage applications list her intent to have the Norfolk, VA property as her primary home. It appears Ms. James' property and mortgage-related misrepresentations may have continued to her recent 2023 Norfolk, VA property purchase in order to secure a lower interest rate and more favorable loan terms.

■ *Lafayette Avenue, Brooklyn, NY 11238*

A January 26, 2001 certificate of occupancy lists this property as having five units. **See Exhibit C.** On February 14, 2001, Ms. Letitia James purchased this five-family dwelling. Ms. James secured a conforming loan through the Fannie Mae/Freddie Mac Form 3033. Conforming loans are only available on 4 unit or less structures. Spanning the last two decades, Ms. James has consistently misrepresented the same property as only having four units in both building permit applications and numerous mortgage documents and applications. This even includes a 2011 application for the Home Affordable Modification Program ("HAMP"). **See Exhibit D**. And most recently a 2019 mortgage refinancing through a Fannie Mae and Freddie Mac lender. **See Exhibit E.**

Conforming loans, or Fannie Mae and Freddie Mac-backed mortgages, have favorable rates and terms to traditional private market mortgages for the explicit purpose of availability to lower and middle-income borrowers. Conforming single-family loans are subject to a cap of four dwellings per property. A building that exceeds four units must be treated as a multifamily property, and typically has larger down payment requirements and higher interest rates terms—with interest rates being between 0.75-1 percent higher—due to lenders viewing multifamily loans as significantly riskier. Additionally, the government's Home Assistance Modification Program ("HAMP") was started in 2008 to provide homeowners at risk of foreclosure with reduced monthly mortgage payments, and recipients had to have properties with four dwellings or less. It appears

that Ms. James may have listed the Brooklyn, NY property as four units instead of five units in order to meet the conforming loan requirements, and thus receive better interest rates. Ms. James also appears to have used this same falsification in order to receive mortgage assistance through HAMP.

**Analysis:**

Ms. James, for both properties listed above, appears to have falsified records in order to meet certain lending requirements and receive favorable loan terms.

U.S. Federal Housing FHFA believes this and other alleged misconduct could be violations of the criminal code under 18 U.S.C. § 1343 (wire fraud), 18 U.S.C. § 1341 (mail fraud), 18 U.S.C. § 1344 (bank fraud), 18 U.S.C. § 1014 (false statements to a financial institution), and/or other relevant state and federal laws.

For your reference, I have also attached documentation which shows in 1983 that Ms. James and her father signed mortgage documents that stated that they were husband and wife in order to secure a home mortgage. **See Exhibit F.** Then, on May 4, 2000, Ms. James was listed again as "husband and wife" in documents. **See Exhibit G.** While this was a long time ago, it raises serious concerns about the validity of Ms. James representations on mortgage applications.

There are unfortunately too many examples of individuals who commit fraud or mortgage fraud. Just last year, a federal jury convicted Marilyn J. Mosby of Baltimore, Maryland, on the federal charge of making a false mortgage application when she was Baltimore City State's Attorney, relating to the purchase of her property in Florida. Just last week, after the hard work of our agency's IG and the DOJ, a St. Louis man plead guilty to fraudulently obtaining home mortgages.

As always, we look forward to cooperating with the Department of Justice to support any actions that the Department of Justice finds appropriate. U.S. Federal Housing FHFA appreciates the Department of Justice's support in ensuring the protection of American homebuyers and taxpayers from mortgage fraud and other financial misconduct.

Respectfully submitted,

William J. Pulte
Director, U.S. Federal Housing FHFA

# EXHIBIT A

**SPECIFIC POWER OF ATTORNEY**
(Purchase of Real Estate)

KNOW ALL MEN BY THESE PRESENTS, that the undersigned, **LETITIA A. JAMES**, does hereby constitute and appoint **SHAMICE THOMPSON-HAIRSTON** of the City of _Norfolk_, State of _Virginia_, as her Attorney-in-Fact for her in her name, place, and stead, to undertake and to do all acts necessary to complete the purchase of the Property known as ▇▇ Sterling Street, Norfolk, Virginia 23505.

(1) Execution of the Deed of Trust in a loan amount not to exceed $225,000.00
(2) Execution of Real Estate Settlement Procedures Act Forms;
(3) Execution of Note; miscellaneous loan closing documents in a loan amount not to exceed $225,000.00; and
(4) Execution of Purchase Agreements and Addendums with a sales price not to exceed 250,000.00

I HEREBY DECLARE that I intend to occupy this property as my principal residence.

I HEREBY DECLARE that any act or thing done hereunder, by my said Attorney-in-Fact shall be binding on myself, my heirs, my legal and personal representatives, and assigns only insofar as they are consistent with the powers granted herein.

I HEREBY RATIFY all that my said Attorney-in-Fact shall lawfully do or cause to be done by virtue of these powers.

THIS POWER OF ATTORNEY shall not be affected by the subsequent disability or incompetence of said principal.

THIS POWER OF ATTORNEY CAN BE REVOKED OR TERMINATED ONLY BY A WRITING COMMUNICATED TO AND RECEIVED BY MY ATTORNEY-IN-FACT PRIOR TO MY ATTORNEY-IN-FACT EXERCISING SUCH POWER.

THIS POWER OF ATTORNEY SHALL EXPIRE: August 7, 2024

TAX ID#: ▇▇▇

Prepared by: John M. McCormick (VSB#80676)
McCormick Law & Consulting
101 Granby Street, Suite 200
Norfolk, VA 23510

Return to: TitleQuest of Hampton Roads, LLC
828 Greenbrier Pkwy, Suite 100
Chesapeake, VA 23320

Page 1 of 2

---

IN WITNESS WHEREOF, the said **Letitia A. James** has affixed her signature and seal on this _17th_ day of _August_, 2023.

_/s/ Letitia A. James_
Letitia A. James

STATE OF: _New York_
CITY/COUNTY OF: _New York_ to wit:

The foregoing instrument was acknowledged, subscribed to, and executed before me this _17th_ day of _August_, 2023, by Letitia A. James. In addition, Letitia A. James is personally known to me or has produced appropriate identification.

Notary Public: _/s/ Julius Crockwell_
My Commission Expires: _April 14, 2024_
My Registration No.: _01CR6145293_

JULIUS CROCKWELL
NOTARY PUBLIC, STATE OF NEW YORK
NO. 01CR6165293
QUALIFIED IN QUEENS COUNTY
MY COMMISSION EXPIRES APR 14, 2024

On the date last above written, declared to us, the undersigned, that the foregoing instrument was her Specific Power of Attorney and requested us to act as witnesses to it. That to the best of our knowledge, Letitia A. James was of eighteen years of age or over, of sound mind, and under no constraint or undue influence. Letitia A. James thereupon signed this Specific Power of Attorney in our presence, all of us being present at the same time. We now, at her request, in her presence and in the presence of each other, subscribe our names as witnesses.

Executed on _August 17, 2023_ in _New York County, NYS_

We declare under penalty of perjury that the foregoing is true and correct.

▇▇▇
[signature – please print name under this line]
_TRANIECE LEWIS_

▇▇▇ Parkside Ave
Brooklyn NY 11226
[address]

▇▇▇
[signature – please print name under this line]
SHARONA PARCHMENT

▇▇▇ Pine Street
Staten Island NY 10301
[address]

Page 2 of 2

4

# EXHIBIT B



LOAN #: 6020537788

**4. Charges; Liens.** Borrower shall pay all taxes, assessments, charges, fines, and impositions attributable to the Property which can attain priority over this Security Instrument, leasehold payments or ground rents on the Property, if any, and Community Association Dues, Fees, and Assessments, if any. To the extent that these items are Escrow Items, Borrower shall pay them in the manner provided in Section 3.

Borrower shall promptly discharge any lien which has priority over this Security Instrument unless Borrower: (a) agrees in writing to the payment of the obligation secured by the lien in a manner acceptable to Lender, but only so long as Borrower is performing such agreement; (b) contests the lien in good faith by, or defends against enforcement of the lien in, legal proceedings which in Lender's opinion operate to prevent the enforcement of the lien while those proceedings are pending, but only until such proceedings are concluded; or (c) secures from the holder of the lien an agreement satisfactory to Lender subordinating the lien to this Security Instrument. If Lender determines that any part of the Property is subject to a lien which can attain priority over this Security Instrument, Lender may give Borrower a notice identifying the lien. Within 10 days of the date on which that notice is given, Borrower shall satisfy the lien or take one or more of the actions set forth above in this Section 4.

**5. Property Insurance.** Borrower shall keep the improvements now existing or hereafter erected on the Property insured against loss by fire, hazards included within the term "extended coverage," and any other hazards including, but not limited to, earthquakes and floods, for which Lender requires insurance. This insurance shall be maintained in the amounts (including deductible levels) and for the periods that Lender requires. What Lender requires pursuant to the preceding sentences can change during the term of the Loan. The insurance carrier providing the insurance shall be chosen by Borrower subject to Lender's right to disapprove Borrower's choice, which right shall not be exercised unreasonably. Lender may require Borrower to pay, in connection with this Loan, either: (a) a one-time charge for flood zone determination, certification and tracking services; or (b) a one-time charge for flood zone determination and certification services and subsequent charges each time remappings or similar changes occur which reasonably might affect such determination or certification. Borrower shall also be responsible for the payment of any fees imposed by the Federal Emergency Management Agency in connection with the review of any flood zone determination resulting from an objection by Borrower.

If Borrower fails to maintain any of the coverages described above, Lender may obtain insurance coverage, at Lender's option and Borrower's expense. Lender is under no obligation to purchase any particular type or amount of coverage. Therefore, such coverage shall cover Lender, but might or might not protect Borrower, Borrower's equity in the Property, or the contents of the Property, against any risk, hazard or liability and might provide greater or lesser coverage than was previously in effect. Borrower acknowledges that the cost of the insurance coverage so obtained might significantly exceed the cost of insurance that Borrower could have obtained. Any amounts disbursed by Lender under this Section 5 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

All insurance policies required by Lender and renewals of such policies shall be subject to Lender's right to disapprove such policies, shall include a standard mortgage clause, and shall name Lender as mortgagee and/or as an additional loss payee. Lender shall have the right to hold the policies and renewal certificates. If Lender requires, Borrower shall promptly give to Lender all receipts of paid premiums and renewal notices. If Borrower obtains any form of insurance coverage, not otherwise required by Lender, for damage to, or destruction of, the Property, such policy shall include a standard mortgage clause and shall name Lender as mortgagee and/or as an additional loss payee.

In the event of loss, Borrower shall give prompt notice to the insurance carrier and Lender. Lender may make proof of loss if not made promptly by Borrower. Unless Lender and Borrower otherwise agree in writing, any insurance proceeds, whether or not the underlying insurance was required by Lender, shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such insurance proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such insurance proceeds, Lender shall not be required to pay Borrower any interest or earnings on such proceeds. Fees for public adjusters, or other third parties, retained by Borrower shall not be paid out of the insurance proceeds and shall be the sole obligation of Borrower. If the restoration or repair is not economically feasible or Lender's security would be lessened, the insurance proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such insurance proceeds shall be applied in the order provided for in Section 2.

If Borrower abandons the Property, Lender may file, negotiate and settle any available insurance claim and related matters. If Borrower does not respond within 30 days to a notice from Lender that the insurance carrier has offered to settle a claim, then Lender may negotiate and settle the claim. The 30-day period will begin when the notice is given. In either event, or if Lender acquires the Property under Section 24 or otherwise, Borrower hereby assigns to Lender (a) Borrower's rights to any insurance proceeds in an amount not to exceed the amounts unpaid under the Note or this Security Instrument, and (b) any other of Borrower's rights (other than the right to any refund of unearned premiums paid by Borrower) under all insurance policies covering the Property, insofar as such rights are applicable to the

coverage of the Property. Lender may use the insurance proceeds either to repair or restore the Property or to pay amounts unpaid under the Note or this Security Instrument, whether or not then due.

**6. Occupancy.** Borrower shall occupy, establish, and use the Property as Borrower's principal residence within 60 days after the execution of this Security Instrument and shall continue to occupy the Property as Borrower's principal residence for at least one year after the date of occupancy, unless Lender determines that this requirement shall cause undue hardship for the Borrower, or unless extenuating circumstances exist which are beyond Borrower's control.

**7. Preservation, Maintenance and Protection of the Property; Inspections.** Borrower shall not destroy, damage or impair the Property, allow the Property to deteriorate or commit waste on the Property. Borrower shall maintain the Property in order to prevent the Property from deteriorating or decreasing in value due to its condition. Unless it is determined pursuant to Section 5 that repair or restoration is not economically feasible, Borrower shall promptly repair the Property if damaged to avoid further deterioration or damage. If insurance or condemnation proceeds are paid in connection with damage to the Property, Borrower shall be responsible for repairing or restoring the Property only if Lender has released proceeds for such purposes. Lender may disburse proceeds for the repairs and restoration in a single payment or in a series of progress payments as the work is completed. If the insurance or condemnation proceeds are not sufficient to repair or restore the Property, Borrower is not relieved of Borrower's obligation for the completion of such repair or restoration.

If condemnation proceeds are paid in connection with the taking of the property, Lender shall apply such proceeds to the reduction of the indebtedness under the Note and this Security Instrument, first to any delinquent amounts, and then to payment of principal. Any application of the proceeds to the principal shall not extend or postpone the due date of the monthly payments or change the amount of such payments.

Lender or its agent may make reasonable entries upon and inspections of the Property. If it has reasonable cause, Lender may inspect the interior of the improvements on the Property. Lender shall give Borrower notice at the time of or prior to such an interior inspection specifying such reasonable cause.

**8. Borrower's Loan Application.** Borrower shall be in default if, during the Loan application process, Borrower or any persons or entities acting at the direction of Borrower or with Borrower's knowledge or consent gave materially false, misleading, or inaccurate information or statements to Lender (or failed to provide Lender with material information) in connection with the Loan. Material representations include, but are not limited to, representations concerning Borrower's occupancy of the Property as Borrower's principal residence.

**9. Protection of Lender's Interest in the Property and Rights Under this Security Instrument.** If (a) Borrower fails to perform the covenants and agreements contained in this Security Instrument, (b) there is a legal proceeding that might significantly affect Lender's interest in the Property and/or rights under this Security Instrument (such as a proceeding in bankruptcy, probate, for condemnation or forfeiture, for enforcement of a lien which may attain priority over this Security Instrument or to enforce laws or regulations), or (c) Borrower has abandoned the Property, then Lender may do and pay for whatever is reasonable or appropriate to protect Lender's interest in the Property and rights under this Security Instrument, including protecting and/or assessing the value of the Property, and securing and/or repairing the Property. Lender's actions can include, but are not limited to: (a) paying any sums secured by a lien which has priority over this Security Instrument; (b) appearing in court; and (c) paying reasonable attorneys' fees to protect its interest in the Property and/or rights under this Security Instrument, including its secured position in a bankruptcy proceeding. Securing the Property includes, but is not limited to, entering the Property to make repairs, change locks, replace or board up doors and windows, drain water from pipes, eliminate building or other code violations or dangerous conditions, and have utilities turned on or off. Although Lender may take action under this Section 9, Lender does not have to do so and is not under any duty or obligation to do so. It is agreed that Lender incurs no liability for not taking any or all actions authorized under this Section 9.

Any amounts disbursed by Lender under this Section 9 shall become additional debt of Borrower secured by this Security Instrument. These amounts shall bear interest at the Note rate from the date of disbursement and shall be payable, with such interest, upon notice from Lender to Borrower requesting payment.

If this Security Instrument is on a leasehold, Borrower shall comply with all the provisions of the lease. Borrower shall not surrender the leasehold estate and interests herein conveyed or terminate or cancel the ground lease. Borrower shall not, without the express written consent of Lender, alter or amend the ground lease. If Borrower acquires fee title to the Property, the leasehold and the fee title shall not merge unless Lender agrees to the merger in writing.

**10. Assignment of Miscellaneous Proceeds; Forfeiture.** All Miscellaneous Proceeds are hereby assigned to and shall be paid to Lender.

If the Property is damaged, such Miscellaneous Proceeds shall be applied to restoration or repair of the Property, if the restoration or repair is economically feasible and Lender's security is not lessened. During such repair and restoration period, Lender shall have the right to hold such Miscellaneous Proceeds until Lender has had an opportunity to inspect such Property to ensure the work has been completed to Lender's satisfaction, provided that such inspection shall be undertaken promptly. Lender may pay for the repairs and restoration in a single disbursement or in a series of progress payments as the work is completed. Unless an agreement is made in writing or Applicable Law requires interest to be paid on such Miscellaneous Proceeds, Lender shall not be required to pay Borrower any interest or earnings on such Miscellaneous Proceeds. If the restoration or repair is not economically feasible or Lender's security would be lessened, the Miscellaneous Proceeds shall be applied to the sums secured

VIRGINIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3047 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
ICE Mortgage Technology, Inc.                Page 5 of 11                    VAEFHA15DE   1120
                                                                              VAEDEED (CLS)
                                                                              08/31/2023 11:56 AM PST

VIRGINIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3047 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
ICE Mortgage Technology, Inc.                Page 6 of 11                    VAEFHA15DE   1120
                                                                              VAEDEED (CLS)
                                                                              08/31/2023 11:56 AM PST



LOAN #: 6020537788

by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower. Such Miscellaneous Proceeds shall be applied in the order provided for in Section 2.

In the event of a total taking, destruction, or loss in value of the Property, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument, whether or not then due, with the excess, if any, paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is equal to or greater than the amount of the sums secured by this Security Instrument immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the sums secured by this Security Instrument shall be reduced by the amount of the Miscellaneous Proceeds multiplied by the following fraction: (a) the total amount of the sums secured immediately before the partial taking, destruction, or loss in value divided by (b) the fair market value of the Property immediately before the partial taking, destruction, or loss in value. Any balance shall be paid to Borrower.

In the event of a partial taking, destruction, or loss in value of the Property in which the fair market value of the Property immediately before the partial taking, destruction, or loss in value is less than the amount of the sums secured immediately before the partial taking, destruction, or loss in value, unless Borrower and Lender otherwise agree in writing, the Miscellaneous Proceeds shall be applied to the sums secured by this Security Instrument whether or not the sums are then due.

If the Property is abandoned by Borrower, or if, after notice by Lender to Borrower that the Opposing Party (as defined in the next sentence) offers to make an award to settle a claim for damages, Borrower fails to respond to Lender within 30 days after the date the notice is given, Lender is authorized to collect and apply the Miscellaneous Proceeds either to restoration or repair of the Property or to the sums secured by this Security Instrument, whether or not then due. "Opposing Party" means the third party that owes Borrower Miscellaneous Proceeds or the party against whom Borrower has a right of action in regard to Miscellaneous Proceeds.

Borrower shall be in default if any action or proceeding, whether civil or criminal, is begun that, in Lender's judgment, could result in forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. Borrower can cure such a default and, if acceleration has occurred, reinstate as provided in Section 18, by causing the action or proceeding to be dismissed with a ruling that, in Lender's judgment, precludes forfeiture of the Property or other material impairment of Lender's interest in the Property or rights under this Security Instrument. The proceeds of any award or claim for damages that are attributable to the impairment of Lender's interest in the Property are hereby assigned and shall be paid to Lender.

All Miscellaneous Proceeds that are not applied to restoration or repair of the Property shall be applied in the order provided for in Section 2.

**11. Borrower Not Released; Forbearance By Lender Not a Waiver.** Extension of the time for payment or modification of amortization of the sums secured by this Security Instrument granted by Lender to Borrower or any Successor in Interest of Borrower shall not operate to release the liability of Borrower or any Successors in Interest of Borrower. Lender shall not be required to commence proceedings against any Successor in Interest of Borrower or to refuse to extend time for payment or otherwise modify amortization of the sums secured by this Security Instrument by reason of any demand made by the original Borrower or any Successors in Interest of Borrower. Any forbearance by Lender in exercising any right or remedy including, without limitation, Lender's acceptance of payments from third persons, entities or Successors in Interest of Borrower or in amounts less than the amount then due, shall not be a waiver of or preclude the exercise of any right or remedy.

**12. Joint and Several Liability; Co-signers; Successors and Assigns Bound.** Borrower covenants and agrees that Borrower's obligations and liability shall be joint and several. However, any Borrower who co-signs this Security Instrument but does not execute the Note (a "co-signer"): (a) is co-signing this Security Instrument only to mortgage, grant and convey the co-signer's interest in the Property under the terms of this Security Instrument; (b) is not personally obligated to pay the sums secured by this Security Instrument; and (c) agrees that Lender and any other Borrower can agree to extend, modify, forbear or make any accommodations with regard to the terms of this Security Instrument or the Note without the co-signer's consent.

Subject to the provisions of Section 17, any Successor in Interest of Borrower who assumes Borrower's obligations under this Security Instrument in writing, and is approved by Lender, shall obtain all of Borrower's rights and benefits under this Security Instrument. Borrower shall not be released from Borrower's obligations and liability under this Security Instrument unless Lender agrees to such release in writing. The covenants and agreements of this Security Instrument shall bind (except as provided in Section 19) and benefit the successors and assigns of Lender.

**13. Loan Charges.** Lender may charge Borrower fees for services performed in connection with Borrower's default, for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument, including, but not limited to, attorneys' fees, property inspection and valuation fees. Lender may collect fees and charges authorized by the Secretary. Lender may not charge fees that are expressly prohibited by this Security Instrument or by Applicable Law.

If the Loan is subject to a law which sets maximum loan charges, and that law is finally interpreted so that the interest or other loan charges collected or to be collected in connection with the Loan exceed the permitted limits, then: (a) any such loan charge shall be reduced by the amount necessary to reduce the charge to the permitted limit; and (b) any sums already collected from Borrower which exceeded permitted limits will be refunded to Borrower. Lender may choose to make this refund by reducing the

principal owed under the Note or by making a direct payment to Borrower. If a refund reduces principal, the reduction will be treated as a partial prepayment with no changes in the due date or in the monthly payment amount unless the Note holder agrees in writing to those changes. Borrower's acceptance of any such refund made by direct payment to Borrower will constitute a waiver of any right of action Borrower might have arising out of such overcharge.

**14. Notices.** All notices given by Borrower or Lender in connection with this Security Instrument must be in writing. Any notice to Borrower in connection with this Security Instrument shall be deemed to have been given to Borrower when mailed by first class mail or when actually delivered to Borrower's notice address if sent by other means. Notice to any one Borrower shall constitute notice to all Borrowers unless Applicable Law expressly requires otherwise. The notice address shall be the Property Address unless Borrower has designated a substitute notice address by notice to Lender. Borrower shall promptly notify Lender of Borrower's change of address. If Lender specifies a procedure for reporting Borrower's change of address, then Borrower shall only report a change of address through that specified procedure. There may be only one designated notice address under this Security Instrument at any one time. Any notice to Lender shall be given by delivering it or by mailing it by first class mail to Lender's address stated herein unless Lender has designated another address by notice to Borrower. Any notice in connection with this Security Instrument shall not be deemed to have been given to Lender until actually received by Lender. If any notice required by this Security Instrument is also required under Applicable Law, the Applicable Law requirement will satisfy the corresponding requirement under this Security Instrument.

**15. Governing Law; Severability; Rules of Construction.** This Security Instrument shall be governed by federal law and the law of the jurisdiction in which the Property is located. All rights and obligations contained in this Security Instrument are subject to any requirements and limitations of Applicable Law. Applicable Law might explicitly or implicitly allow the parties to agree by contract or it might be silent, but such silence shall not be construed as a prohibition against agreement by contract. In the event that any provision or clause of this Security Instrument or the Note conflicts with Applicable Law, such conflict shall not affect other provisions of this Security Instrument or the Note which can be given effect without the conflicting provision.

As used in this Security Instrument: (a) words of the masculine gender shall mean and include corresponding neuter words or words of the feminine gender; (b) words in the singular shall mean and include the plural and vice versa; and (c) the word "may" gives sole discretion without any obligation to take any action.

**16. Borrower's Copy.** Borrower shall be given one copy of the Note and of this Security Instrument.

**17. Transfer of the Property or a Beneficial Interest in Borrower.** As used in this Section 17, "Interest in the Property" means any legal or beneficial interest in the Property, including, but not limited to, those beneficial interests transferred in a bond for deed, contract for deed, installment sales contract or escrow agreement, the intent of which is the transfer of title by Borrower at a future date to a purchaser.

If all or any part of the Property or any Interest in the Property is sold or transferred (or if Borrower is not a natural person and a beneficial interest in Borrower is sold or transferred) without Lender's prior written consent, Lender may require immediate payment in full of all sums secured by this Security Instrument. However, this option shall not be exercised by Lender if such exercise is prohibited by Applicable Law.

If Lender exercises this option, Lender shall give Borrower notice of acceleration. The notice shall provide a period of not less than 30 days from the date the notice is given in accordance with Section 14 within which Borrower must pay all sums secured by this Security Instrument. If Borrower fails to pay these sums prior to the expiration of this period, Lender may invoke any remedies permitted by this Security Instrument without further notice or demand on Borrower.

**18. Borrower's Right to Reinstate After Acceleration.** If Borrower meets certain conditions, Borrower shall have the right to reinstatement of a mortgage. Those conditions are that Borrower: (a) pays Lender all sums which then would be due under this Security Instrument and the Note as if no acceleration had occurred; (b) cures any default of any other covenants or agreements; (c) pays all expenses incurred in enforcing this Security Instrument, including, but not limited to, reasonable attorneys' fees, property inspection and valuation fees, and other fees incurred for the purpose of protecting Lender's interest in the Property and rights under this Security Instrument; and (d) takes such action as Lender may reasonably require to assure that Lender's interest in the Property and rights under this Security Instrument, and Borrower's obligation to pay the sums secured by this Security Instrument, shall continue unchanged. However, Lender is not required to reinstate if: (i) Lender has accepted reinstatement after the commencement of foreclosure proceedings within two years immediately preceding the commencement of a current foreclosure proceedings; (ii) reinstatement will preclude foreclosure on different grounds in the future, or (iii) reinstatement will adversely affect the priority of the lien created by this Security Instrument. Lender may require that Borrower pay such reinstatement sums and expenses in one or more of the following forms, as selected by Lender: (a) cash; (b) money order; (c) certified check, bank check, treasurer's check or cashier's check, provided any such check is drawn upon an institution whose deposits are insured by a federal agency, instrumentality or entity; or (d) Electronic Funds Transfer. Upon reinstatement by Borrower, this Security Instrument and obligations secured hereby shall remain fully effective as if no acceleration had occurred. However, this right to reinstate shall not apply in the case of acceleration under Section 17.

**19. Sale of Note; Change of Loan Servicer; Notice of Grievance.** The Note or a partial interest in the Note (together with this Security Instrument) can be sold one or more times without prior notice to Borrower. A sale might result in a change in the entity (known as the "Loan Servicer") that collects Periodic Payments due under the Note and this Security Instrument and performs other mortgage loan servicing obligations under the Note, this Security Instrument, and Applicable Law. There also might be

VIRGINIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3047 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
ICE Mortgage Technology, Inc.                Page 7 of 11                    VAEFHA15DE   1120
                                                                              VAEDEED (CLS)
                                                                              08/31/2023 11:56 AM PST



VIRGINIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT    Form 3047 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
ICE Mortgage Technology, Inc.                Page 8 of 11                    VAEFHA15DE   1120
                                                                              VAEDEED (CLS)
                                                                              08/31/2023 11:56 AM PST



LOAN #: 6020537788

one or more changes of the Loan Servicer unrelated to a sale of the Note. If there is a change of the Loan Servicer, Borrower will be given written notice of the change which will state the name and address of the new Loan Servicer, the address to which payments should be made and any other information RESPA requires in connection with a notice of transfer of servicing. If the Note is sold and thereafter the Loan is serviced by a Loan Servicer other than the purchaser of the Note, the mortgage loan servicing obligations to Borrower will remain with the Loan Servicer or be transferred to a successor Loan Servicer and are not assumed by the Note purchaser unless otherwise provided by the Note purchaser.

**20. Borrower Not Third-Party Beneficiary to Contract of Insurance.** Mortgage Insurance reimburses Lender (or any entity that purchases the Note) for certain losses it may incur if Borrower does not repay the Loan as agreed. Borrower acknowledges and agrees that the Borrower is not a third party beneficiary to the contract of insurance between the Secretary and Lender, nor is Borrower entitled to enforce any agreement between Lender and the Secretary, unless explicitly authorized to do so by Applicable Law.

**21. Hazardous Substances.** As used in this Section 21: (a) "Hazardous Substances" are those substances defined as toxic or hazardous substances, pollutants, or wastes by Environmental Law and the following substances: gasoline, kerosene, other flammable or toxic petroleum products, toxic pesticides and herbicides, volatile solvents, materials containing asbestos or formaldehyde, and radioactive materials; (b) "Environmental Law" means federal laws and laws of the jurisdiction where the Property is located that relate to health, safety or environmental protection; (c) "Environmental Cleanup" includes any response action, remedial action, or removal action, as defined in Environmental Law; and (d) an "Environmental Condition" means a condition that can cause, contribute to, or otherwise trigger an Environmental Cleanup.

Borrower shall not cause or permit the presence, use, disposal, storage, or release of any Hazardous Substances, or threaten to release any Hazardous Substances, on or in the Property. Borrower shall not do, nor allow anyone else to do, anything affecting the Property (a) that is in violation of any Environmental Law, (b) which creates an Environmental Condition, or (c) which, due to the presence, use, or release of a Hazardous Substance, creates a condition that adversely affects the value of the Property. The preceding two sentences shall not apply to the presence, use, or storage on the Property of small quantities of Hazardous Substances that are generally recognized to be appropriate to normal residential uses and to maintenance of the Property (including, but not limited to, hazardous substances in consumer products).

Borrower shall promptly give Lender written notice of (a) any investigation, claim, demand, lawsuit or other action by any governmental or regulatory agency or private party involving the Property and any Hazardous Substance or Environmental Law of which Borrower has actual knowledge, (b) any Environmental Condition, including but not limited to, any spilling, leaking, discharge, release or threat of release of any Hazardous Substance, and (c) any condition caused by the presence, use or release of a Hazardous Substance which adversely affects the value of the Property. If Borrower learns, or is notified by any governmental or regulatory authority, or any private party, that any removal or other remediation of any Hazardous Substance affecting the Property is necessary, Borrower shall promptly take all necessary remedial actions in accordance with Environmental Law. Nothing herein shall create any obligation on Lender for an Environmental Cleanup.

**22. Grounds for Acceleration of Debt.**

(a) **Default.** Lender may, except as limited by regulations issued by the Secretary, in the case of payment defaults, require immediate payment in full of all sums secured by this Security Instrument if:
  (i) Borrower defaults by failing to pay in full any monthly payment required by this Security Instrument prior to or on the due date of the next monthly payment, or
  (ii) Borrower defaults by failing, for a period of thirty days, to perform any other obligations contained in this Security Instrument.

(b) **Sale Without Credit Approval.** Lender shall, if permitted by applicable law (including Section 341(d) of the Garn-St. Germain Depository Institutions Act of 1982, 12 U.S.C. 1701j–3(d)) and with the prior approval of the Secretary, require immediate payment in full of all sums secured by this Security Instrument if:
  (i) All or part of the Property, or a beneficial interest in a trust owning all or part of the Property, is sold or otherwise transferred (other than by devise or descent), and
  (ii) The Property is not occupied by the purchaser or grantee as his or her principal residence, or the purchaser or grantee does so occupy the Property but his or her credit has not been approved in accordance with the requirements of the Secretary.

(c) **No Waiver.** If circumstances occur that would permit Lender to require immediate payment in full, but Lender does not require such payments, Lender does not waive its rights with respect to subsequent events.

(d) **Regulations of HUD Secretary.** In many circumstances regulations issued by the Secretary will limit Lender's rights, in the case of payment defaults, to require immediate payment in full and foreclose if not paid. This Security Instrument does not authorize acceleration or foreclosure if not permitted by regulations of the Secretary.

(e) **Mortgage Not Insured.** Borrower agrees that if this Security Instrument and the Note are not determined to be eligible for insurance under the National Housing Act within 60 days from the date hereof, Lender may, at its option, require immediate payment in full of all sums secured by this Security Instrument. A written statement of any authorized agent of the Secretary dated subsequent to 60 days from the date hereof, declining to insure this Security Instrument and the Note, shall be deemed conclusive proof of such ineligibility. Notwithstanding the foregoing, this option may not be exercised by Lender when the unavailability of insurance is solely due to Lender's failure to remit a mortgage insurance premium to the Secretary.

VIRGINIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3047 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
ICE Mortgage Technology, Inc.   Page 9 of 11   VAEFHA15DE 1120
VAEDEED (CLS)
08/31/2023 11:56 AM PST

---

LOAN #: 6020537788

**NON-UNIFORM COVENANTS.** Borrower and Lender further covenant and agree as follows:

**23. Assignment of Rents.** Borrower unconditionally assigns and transfers to Lender all the rents and revenues of the Property. Borrower authorizes Lender or Lender's agents to collect the rents and revenues and hereby directs each tenant of the Property to pay the rents to Lender or Lender's agents. However, prior to Lender's notice to Borrower of Borrower's breach of any covenant or agreement in the Security Instrument, Borrower shall collect and receive all rents and revenues of the Property as trustee for the benefit of Lender and Borrower. This assignment of rents constitutes an absolute assignment and not an assignment for additional security only.

If Lender gives notice of breach to Borrower: (a) all rents received by Borrower shall be held by Borrower as trustee for benefit of Lender only, to be applied to the sums secured by the Security Instrument; (b) Lender shall be entitled to collect and receive all of the rents of the Property; and (c) each tenant of the Property shall pay all rents due and unpaid to Lender or Lender's agent on Lender's written demand to the tenant.

Borrower has not executed any prior assignment of the rents and has not and will not perform any act that would prevent Lender from exercising its rights under this Section 23.

Lender shall not be required to enter upon, take control of or maintain the Property before or after giving notice of breach to Borrower. However, Lender or a judicially appointed receiver may do so at any time there is a breach. Any application of rents shall not cure or waive any default or invalidate any other right or remedy of Lender. This assignment of rents of the Property shall terminate when the debt secured by the Security Instrument is paid in full.

**24. Acceleration; Remedies.** Lender shall give notice to Borrower prior to acceleration following Borrower's breach of any covenant or agreement in this Security Instrument (but not prior to acceleration under Section 17 unless Applicable Law provides otherwise). The notice shall specify: (a) the default; (b) the action required to cure the default; (c) a date, not less than 30 days from the date the notice is given to Borrower, by which the default must be cured; and (d) that failure to cure the default on or before the date specified in the notice may result in acceleration of the sums secured by this Security Instrument and sale of the Property. The notice shall further inform Borrower of the right to reinstate after acceleration and the right to bring a court action to assert the non-existence of a default or any other defense of Borrower to acceleration and sale. If the default is not cured on or before the date specified in the notice, Lender at its option may require immediate payment in full of all sums secured by this Security Instrument without further demand and may invoke the power of sale and any other remedies permitted by Applicable Law. Lender shall be entitled to collect all expenses incurred in pursuing the remedies provided in this Section 24, including, but not limited to, reasonable attorneys' fees and costs of title evidence.

If Lender invokes the power of sale, Lender or Trustee shall give to Borrower, the owner of the Property, and all other persons, notice of sale as required by Applicable Law. Trustee shall give public notice of sale by advertising, in accordance with Applicable Law, once a week for two successive weeks in a newspaper having general circulation in the county or city in which any part of the Property is located, and by such additional or different form of advertisement the Trustee deems advisable. Trustee may sell the Property on the eighth day after the first advertisement or any day thereafter, but not later than 30 days following the last advertisement. Trustee, without demand on Borrower, shall sell the Property at public auction to the highest bidder at the time and place and under the terms designated in the notice of sale in one or more parcels and in any order Trustee determines. Trustee may postpone sale of all or any parcel of the Property by advertising in accordance with Applicable Law. Lender or its designee may purchase the Property at any sale.

Trustee shall deliver to the purchaser Trustee's deed conveying the Property with special warranty of title. The recitals in the Trustee's deed shall be prima facie evidence of the truth of the statements made therein. Trustee shall apply the proceeds of the sale in the following order: (a) to discharge the expenses of executing the trust, including a reasonable commission to Trustee; (b) to discharge all taxes, levies, and assessment, with costs and interest if these costs have priority over the lien of this Security Instrument, including the due pro rata thereof for the current year; (c) to discharge in the order of their priority, if any, the remaining debts and obligations secured by this Security Instrument, and any liens of record inferior to this Security Instrument under which sale is made, with lawful interest; and, (d) the residue of the proceeds shall be paid to Borrower or Borrower's assigns. Trustee shall not be required to take possession of the Property prior to the sale thereof or to deliver possession of the Property to the purchaser at the sale.

If the Lender's interest in this Security Instrument is held by the Secretary and the Secretary requires immediate payment in full under Section 22, the Secretary may invoke the nonjudicial power of sale provided in the Single Family Mortgage Foreclosure Act of 1994 ("Act") (12 U.S.C. 3751 et seq.) by requesting a foreclosure commissioner designated under the Act to commence foreclosure and to sell the Property as provided in the Act. Nothing in the preceding sentence shall deprive the Secretary of any rights otherwise available to a Lender under this Section 24 or applicable law.

**25. Release.** Upon payment of all sums secured by this Security Instrument, Lender shall request Trustee to release this Security Instrument and shall surrender all notes evidencing debt secured by this Security Instrument to Trustee. Trustee shall release this Security Instrument. Borrower shall pay any recordation costs. Lender may charge Borrower a fee for releasing this Security Instrument, but only

VIRGINIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3047 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
ICE Mortgage Technology, Inc.   Page 10 of 11   VAEFHA15DE 1120
VAEDEED (CLS)
08/31/2023 11:56 AM PST

---

LOAN #: 6020537788

if the fee is paid to a third party for services rendered and the charging of the fee is permitted under Applicable Law.

**26. Substitute Trustee.** Lender, at its option, may from time to time remove Trustee and appoint a successor trustee to any Trustee appointed hereunder. Without conveyance of the Property, the successor trustee shall succeed to all the title, power and duties conferred upon Trustee herein and by Applicable Law.

**NOTICE: THE DEBT SECURED HEREBY IS SUBJECT TO CALL IN FULL OR THE TERMS THEREOF BEING MODIFIED IN THE EVENT OF SALE OR CONVEYANCE OF THE PROPERTY CONVEYED.**

BY SIGNING BELOW, Borrower accepts and agrees to the terms and covenants contained in this Security Instrument and in any Rider executed by Borrower and recorded with it.

_Shanice Thompson-Hairston_                            8/31/23 (Seal)
**SHAMICE THOMPSON-HAIRSTON**                          DATE
Shanice Thompson-Hairston as Attorney in
Fact for Letitia A. James                              8/31/23 (Seal)
**SHAMICE THOMPSON-HAIRSTON, AS ATTORNEY-IN-FACT FOR LETITIA A. JAMES**   DATE

Commonwealth of VIRGINIA
City/County of NORFOLK

The foregoing instrument was acknowledged before me this AUGUST 31, 2023 (date) by SHAMICE THOMPSON-HAIRSTON AND SHAMICE THOMPSON-HAIRSTON, AS ATTORNEY-IN-FACT FOR LETITIA A. JAMES.

Notary Seal

_Michelle Norfleet_
Notary Public's signature

MICHELLE R NORFLEET
Notary Public - Reg. # 301934
Commonwealth of Virginia
My Commission Expires Apr. 30, 2025

Notary registration number: 301934
My commission expires: 4/30/2025

Lender: American Neighborhood Mortgage Acceptance Company LLC.
NMLS ID: 338923
Loan Originator: Mike Voci
NMLS ID: 1380990

VIRGINIA – Single Family – Fannie Mae/Freddie Mac UNIFORM INSTRUMENT   Form 3047 1/01
Modified for FHA 9/2014 (HUD Handbook 4000.1)
ICE Mortgage Technology, Inc.   Page 11 of 11   VAEFHA15DE 1120
VAEDEED (CLS)
08/31/2023 11:56 AM PST

**EXHIBIT C**



THE CITY OF NEW YORK
# DEPARTMENT OF BUILDINGS
## CERTIFICATE OF OCCUPANCY

**BOROUGH** BROOKLYN  DATE: JAN 26 2001  NO. 3P0010437
This certificate supersedes C.O. NO                        ZONING DISTRICT R-6
THIS CERTIFIES that the new—altered—existing—building—premises located at
296 LAFAYETTE AVENUE                      Block 1947    Lot 21
CONFORMS SUBSTANTIALLY TO THE APPROVED PLANS AND SPECIFICATIONS AND TO THE REQUIREMENTS OF ALL APPLICABLE LAWS, RULES, AND REGULATIONS FOR THE USES AND OCCUPANCIES SPECIFIED HEREIN.

### PERMISSIBLE USE AND OCCUPANCY

| STORY | LIVE LOAD LBS. PER SQ. FT. | MAXIMUM NO. OF PERSONS PERMITTED | ZONING DWELLING OR ROOMING UNITS | BUILDING CODE HABITABLE ROOMS | ZONING USE GROUP | BUILDING CODE OCCUPANCY GROUP | DESCRIPTION OF USE |
|---|---|---|---|---|---|---|---|
| CELLAR | OG | | | | | | ORDINARY USE, BOILER ROOM |
| BASEMENT | 40 | | 1 | 3 | 2 | RES. | ONE FAMILY |
| FIRST | 40 | | 1 | 2 | 2 | RES. | ONE FAMILY |
| SECOND | 40 | | 1 | 2 | 2 | RES. | ONE FAMILY |
| THIRD | 40 | | 2 | 2 | 2 | RES. | TWO FAMILY |
| | | | | | | | TOTAL: FIVE (5) FAMILY DWELLING |

OPEN SPACE USES_____
                    (SPECIFY—PARKING SPACES, LOADING BERTHS, OTHER USES, NONE)

NO CHANGES OF USE OR OCCUPANCY SHALL BE MADE UNLESS
A NEW AMENDED CERTIFICATE OF OCCUPANCY IS OBTAINED
THIS CERTIFICATE OF OCCUPANCY IS ISSUED SUBJECT TO FURTHER LIMITATIONS, CONDITIONS AND SPECIFICATIONS NOTED ON THE REVERSE SIDE.

BOROUGH SUPERINTENDENT          Acting Commissioner  BKLN-?
                                 COMMISSIONER

☐ ORIGINAL   ☐ OFFICE COPY - DEPARTMENT OF BUILDINGS   ☐ COPY

# **EXHIBIT D**

| NYC DEPARTMENT OF FINANCE<br>OFFICE OF THE CITY REGISTER<br><br>This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document. | 2011101900646002001E228C |
|---|---|
| **RECORDING AND ENDORSEMENT COVER PAGE** | **PAGE 1 OF 11** |

**Document ID:** 2011101900646002  Document Date: 08-23-2011  Preparation Date: 10-19-2011
Document Type: MORTGAGE AND CONSOLIDATION
Document Page Count: 9

| PRESENTER: | RETURN TO: |
|---|---|
| INTRACOASTAL ABSTRACT CO., INC.<br>31 STEWART STREET<br>CO -PICK UP USTA<br>FLORAL PARK, NY 11001<br>516-358-0505<br>1273 | OCWEN LOAN SERVICING, LLC<br>1661 WORTHINGTON ROAD - SUITE 100<br>ATTN: LINDA KAY ESTEP<br>WEST PALM BEACH, FL 33409<br>561-682-8835 |

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 1947 | 21 | Entire Lot | 296 LAFAYETTE AVENUE |

Property Type: DWELLING ONLY - 4 FAMILY

**CROSS REFERENCE DATA**

CRFN: 2005000404883
x  Additional Cross References on Continuation Page

**PARTIES**

| MORTGAGOR: | MORTGAGEE: |
|---|---|
| LETITIA JAMES<br>296 LAFAYETTE AVENUE<br>BROOKLYN, NY 11238 | US BANK NA, AS TRUSTEE<br>C/O OCWEN LOAN SERVICING, LLC, 1661<br>WORTHINGTON ROAD - SUITE 100<br>WEST PALM BEACH, FL 33409 |

**FEES AND TAXES**

| Mortgage | | | Filing Fee: | | |
|---|---|---|---|---|---|
| Mortgage Amount: | $ | 585,929.55 | | $ | 0.00 |
| Taxable Mortgage Amount: | $ | 29,033.17 | NYC Real Property Transfer Tax: | | |
| Exemption: | | 255 | | $ | 0.00 |
| TAXES: County (Basic): | $ | 145.00 | NYS Real Estate Transfer Tax: | | |
| City (Additional): | $ | 290.00 | | $ | 0.00 |
| Spec (Additional): | $ | 0.00 | **RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK** | | |
| TASF: | $ | 72.50 | | | |
| MTA: | $ | 87.00 | | | |
| NYCTA: | $ | 0.00 | Recorded/Filed | | 12-07-2011 15:31 |
| Additional MRT: | $ | 0.00 | City Register File No.(CRFN): | | |
| TOTAL: | $ | 594.50 | | | 2011000427870 |
| Recording Fee: | $ | 82.00 | | | |
| Affidavit Fee: | $ | 8.00 | | | |



*City Register Official Signature*

9

# EXHIBIT E

**NYC DEPARTMENT OF FINANCE**
**OFFICE OF THE CITY REGISTER**

This page is part of the instrument. The City Register will rely on the information provided by you on this page for purposes of indexing this instrument. The information on this page will control for indexing purposes in the event of any conflict with the rest of the document.

2019082900029001001E8A0E

**RECORDING AND ENDORSEMENT COVER PAGE** — PAGE 1 OF 8

Document ID: 2019082900029001
Document Type: MORTGAGE
Document Page Count: 7
Document Date: 08-23-2019
Preparation Date: 08-29-2019

**PRESENTER:**
SERVICELINK HOME EQUITY
1355 CHERRINGTON PKWY
MOON TOWNSHIP, PA 15108
SUPPORT@SIMPLIFILE.COM

**RETURN TO:**
SERVICELINK
1355 CHERRINGTON PARKWAY
MOON TOWNSHIP, PA 15108
SUPPORT@SIMPLIFILE.COM

**PROPERTY DATA**

| Borough | Block | Lot | Unit | Address |
|---|---|---|---|---|
| BROOKLYN | 1947 | 21 | Entire Lot | 296 LAFAYETTE AVENUE |

Property Type: DWELLING ONLY - 4 FAMILY

**CROSS REFERENCE DATA**

CRFN_____ or DocumentID_____ or _____ Year_____ Reel____ Page_____ or File Number_____

**PARTIES**

MORTGAGOR/BORROWER:
LETITIA JAMES
296 LAFAYETTE AVE
BROOKLYN, NY 11238

MORTGAGEE/LENDER:
CITIBANK NA
1000 TECHNOLOGY DRIVE
O'FALLON, MO 63368

**FEES AND TAXES**

| Mortgage: | | |
|---|---|---|
| Mortgage Amount: | $ | 100,000.00 |
| Taxable Mortgage Amount: | $ | 100,000.00 |
| Exemption: | | |
| TAXES: County (Basic): | $ | 500.00 |
| City (Additional): | $ | 1,000.00 |
| Spec (Additional): | $ | 0.00 |
| TASF: | $ | 250.00 |
| MTA: | $ | 300.00 |
| NYCTA: | $ | 0.00 |
| Additional MRT: | $ | 0.00 |
| TOTAL: | $ | 2,050.00 |
| Recording Fee: | $ | 72.00 |
| Affidavit Fee: | $ | 0.00 |

Filing Fee: $ 0.00
NYC Real Property Transfer Tax: $ 0.00
NYS Real Estate Transfer Tax: $ 0.00

RECORDED OR FILED IN THE OFFICE OF THE CITY REGISTER OF THE CITY OF NEW YORK
Recorded/Filed   08-30-2019 15:23
City Register File No.(CRFN): 2019000279773

*Annette M Hill*
*City Register Official Signature*

10

# EXHIBIT F

**STATE OF NEW YORK**

*This form is used in connection with mortgages insured under the one to four-family provisions of the National Housing Act.*

## MORTGAGE

THIS MORTGAGE, made the 20TH day of MAY, 19 83 between ROBERT JAMES AND LETITIA JAMES, HIS WIFE

who reside(s) at 109-59 132ND ST., RICHMOND HILL, NEW YORK

REEL 1529 PAGE 1110

and KADILAC FUNDING LTD.,
a corporation organized and existing under the laws of the State of New York
and having its principal place of business at 1 OLD COUNTRY ROAD, BOX 34, CARLE PLACE, NEW YORK

the MORTGAGEE,

WITNESSETH that to secure the payment of an indebtedness in the principal sum of
THIRTY THOUSAND THREE HUNDRED AND NO/100 Dollars ($ 30,300.00
which sum is to be paid, with interest thereon, according to a certain bond or obligation bearing even date herewith, the Mortgagor hereby mortgages to the Mortgagee:

All that certain lot, piece, or parcel of land with the buildings and improvements thereon erected, situate, lying, and being in the

BOROUGH AND COUNTY OF QUEENS, CITY AND STATE OF NEW YORK, BOUNDED AND DESCRIBED AS FOLLOWS:

BEGINNING AT A POINT ON THE WESTERLY SIDE OF INWOOD STREET, DISTANT EIGHTEEN (18) FEET SOUTHERLY FROM THE CORNER FORMED BY THE INTERSECTION OF THE WESTERLY SIDE OF INWOOD STREET WITH THE SOUTHERLY SIDE OF 114TH AVENUE;

RUNNING THENCE WESTERLY PARALLEL WITH 114TH AVENUE AND PART OF THE DISTANCE THROUGH A PARTY WALL ONE HUNDRED (100) FEET;

THENCE SOUTHERLY PARALLEL WITH INWOOD STREET SIXTEEN (16) FEET;

THENCE EASTERLY PARALLEL WITH 114TH AVENUE AND PART OF THE DISTANCE THROUGH ANOTHER PARTY WALL ONE HUNDRED (100) FEET TO THE WESTERLY SIDE OF INWOOD STREET; AND

THENCE NORTHERLY ALONG THE WESTERLY SIDE OF INWOOD STREET SIXTEEN (16) FEET TO THE POINT OR PLACE OF BEGINNING.

TOGETHER WITH THE BENEFITS AND SUBJECT TO THE BURDENS OF A CERTAIN RIGHT OF WAY IN LIBER 3034 PAGE 120.

Fixtures and personality include, without being limited to:

Said premises being known as: 114-04 INWOOD STREET, JAMAICA, NEW YORK 11420

The real property is improved by a ONE family residence only.

Together with all the right, title and interest of the mortgagors of in and to any land lying in the bed of the street in front of and adjoining above premises to the center lines thereof.

FG 92159M(1/79)

IN WITNESS WHEREOF, this mortgage has been duly executed by the Mortgagor.

_____ (L.S.)
ROBERT JAMES

_____ (L.S.)
LETITIA JAMES

_____ (L.S.)

_____ (L.S.)

In presence of  Jack Bleier

STATE OF NEW YORK,
COUNTY OF  NASSAU  } ss

ss:

On the 20TH day of MAY nineteen hundred and EIGHTY-THREE before me personally came ROBERT JAMES AND LETITIA JAMES, HIS WIFE to me personally known and known to me to be the individual described in and who executed the foregoing instrument and acknowledged that executed the same

11

## EXHIBIT G

REEL 5580 PG 1798                                    L4221520

PIF

NEW YORK DISCHARGE

KNOW ALL MEN BY THESE PRESENTS,

THAT      HomeSide Lending, Inc.

          9601 McAllister Frwy
          San Antonio, TX  78216

Does hereby certify that the following Mortgage is paid, and does hereby consent that the same be discharged of record,

Mortgage dated the 20TH day of MAY, 1983, made by
ROBERT JAMES AND LETITIA JAMES, HIS WIFE

to KADILAC FUNDING LTD.
in the principal sum of $30300.00 and recorded on the 7TH day of JUNE, 1983 in Book/Reel 1539 of Mortgages, Page 1110, in the office of the Clerk of the County of NEW YORK CITY D, State of New York, Lot 7, Block 11975, Section 52 Township.

ASSIGNED FROM KADILAC FUNDING LTD. TO THE RICHARD GILL COMPANY ON 6/7/83, REC 6/27/83, RL 1545, PG 878; ASSIGNED FROM THE RICHARD GILL COMPANY TO BANCPLUS MORTGAGE CORP. ON 9/23/87, REC 11/12/87, RL 2491, PG 0502.

Property Address: 114-04 INWOOD STREET JAMAICA, NY 11420
Which Mortgage has not been further assigned of record.

Dated APRIL 17, 2000
In presence of:

Attest:                               HomeSide Lending, Inc.
                                      successor by merger to
_____               BancPLUS Mortgage Corp.
B SANTELLAN
ASSISTANT SECRETARY

                                      _____
                                      NANCY STATON, ASSISTANT VICE PRESIDENT

STATE OF Texas      )
                    ) SS:
COUNTY OF Bexar     )

12