**IN THE UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF VIRGINIA**

*Norfolk Division*

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | * | |
| | * | |
| v. | * | Case No. 2:25-cr-122-JKW-DEM |
| | * | |
| LETITIA A. JAMES, | * | |
| | * | |
| Defendant. | * | |
| | * | |
| *   *   *   *   *   *   * | * | |

**REPLY MEMORANDUM OF LAW IN SUPPORT OF ATTORNEY GENERAL
LETITIA JAMES'S MOTION TO DISMISS THE INDICTMENT AND
<u>ENJOIN THE PROSECUTION</u>**

**TABLE OF CONTENTS**

INTRODUCTION ................................................................................................................... 1

ARGUMENT .......................................................................................................................... 2

    I.     THE GOVERNMENT'S THEORY OF SECTION 546 WOULD ELIMINATE THE SENATE'S ROLE IN THE APPOINTMENTS PROCESS ......................................... 2

    II.    THE GOVERNMENT'S ANALYSIS OF SECTION 546 IS FUNDAMENTALLY FLAWED. ............................................................................................................... 3

    III.   DISMISSAL OF THIS DEFECTIVE INDICTMENT IS THE ONLY PROPER REMEDY ................................................................................................................ 13

CONCLUSION ..................................................................................................................... 20

## TABLE OF AUTHORITIES

**Cases**

*Bank of Nova Scotia v. United States*,
    487 U.S. 250 (1988)...................................................................................... 18

*Chapman v. California*,
    386 U.S. 18 (1967)........................................................................................ 19

*Collins v. Yellen*,
    594 U.S. 220 (2021)...................................................................................... 17

*Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*,
    33 F.4th 218 (5th Cir. 2022).......................................................................... 17

*Dames & Moore v. Regan*,
    453 U.S. 654 (1981)...................................................................................... 10

*Edmond v. United States*,
    520 U.S. 651 (1997)........................................................................................ 2

*Exxon Mobil Corp. v. Allapattah Servs., Inc.*,
    545 U.S. 546 (2005)........................................................................................ 9

*Gun Owners of Am., Inc. v. Garland*,
    19 F.4th 890 (6th Cir. 2021).......................................................................... 17

*Loper Bright Enterprises v. Raimondo*,
    603 U.S. 369 (2024)...................................................................................... 12

*Lucia v. SEC*,
    585 U.S. 237 (2018)...................................................................................... 17

*Medellín v. Texas*,
    552 U.S. 491 (2008)...................................................................................... 10

*N.L.R.B. v. SW Gen., Inc.*,
    580 U.S. 288 (2017).................................................................................. 9, 11

*Neaderland v. Comm'r*,
    424 F.2d 639 (2d Cir. 1970).......................................................................... 17

*Parker v. United States*,
    2006 WL 2597770 (E.D. Ark. Sept. 8, 2006). ............................................. 15

*Ryder v. United States*,
    515 U.S. 177 (1995)...................................................................................... 17

*Salomon-Guillen v. Garland*,
    123 F.4th 709 (4th Cir. 2024) ......................................................................... 8

*United States v. Adams*,
    777 F. Supp. 3d 185 (S.D.N.Y. 2025).................................................... 19, 20

*United States v. Bennett*,
    464 F. App'x 183 (4th Cir. 2012) ................................................................... 15

*United States v. Davila*,
    569 U.S. 597 (2013) ................................................................................... 18

*United States v. Durham*,
    941 F.2d 886 (9th Cir. 1991) ............................................................... 15, 16

*United States v. Giordano*,
    416 U.S. 505 (1974) ..................................................................................... 6

*United Sates v. Giraud*,
    2025 WL 2416737 (D.N.J. Aug. 21, 2025) ................................................... 7

*United States v. Hasting*,
    461 U.S. 499 (1983) ................................................................................... 20

*United States v. Kelley*,
    404 F. Supp. 3d 447 (D. Mass. 2019) ................................................... 14, 15

*United States v. Morton*,
    467 U.S. 822 (1984) ..................................................................................... 4

*United States v. Providence Journal Co.*,
    485 U.S. 693 (1988) ................................................................................... 15

*United States v. Trump*,
    740 F. Supp. 3d 1245 (S.D. Fla. 2024) ................................................. 16, 17

*Wille v. Lutnick*,
    2025 WL 3039191 (4th Cir. Oct. 31, 2025) .......................................... 17, 18

*Woods v. United States*,
    2010 WL 4746138 (M.D.N.C. Nov. 16, 2010) ........................................... 15

**Statutes**

28 U.S.C. § 541 .............................................................................. 2, 7, 8

28 U.S.C. § 545 ..................................................................................... 4

28 U.S.C. § 546 ............................................................................. passim

Act of June 25, 1948, ch. 646, § 1, 62 Stat. 909 ..................................... 13

Judiciary Act of 1789, 1 Stat. 73 § 35 ...................................................... 2

**Other Authorities**

153 Cong. Rec. S3298 (2007) .................................................................. 10

153 Cong. Rec. S3302 (2007) .................................................................... 9

8 C.F.R. § 1003.1(a) ............................................................................ 8, 9

A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts (2012) ...................... 5, 6

*Definition of Vacancy for the Purpose of Interim Appointment of United States Attorneys pursuant to 28 U.S.C. 546, as amended*, Office of Legal Counsel (Nov. 13, 1986). ............ 11

H.R. Rep. No. 110–58 (2007) .................................................................................... 3, 10

Henry B. Hogue, Cong. Rsch. Serv., RS21412, *Temporarily Filling Presidentially Appointed, Senate-Confirmed Positions* (Jan. 25, 2008).......................................................... 10

James A. Heilpern, *Interim United States Attorneys*, 28 Geo. Mason L. Rev. 187 (2020) ........... 2

**Constitutional Provisions**

U.S. Const. amend. XIV, § 3 ......................................................................................... 4

## INTRODUCTION

The unlawful attempt to install Lindsey Halligan as interim U.S. Attorney was neither a "paperwork error" nor a "procedural misstep in how the Attorney General phrased the appointment." Br. 26, 19. It was a fundamental violation of 28 U.S.C. § 546 and the Appointments Clause that mandates the dismissal of this indictment. Since the first Congress, the appointment of U.S. Attorneys has required the advice and consent of the Senate. In attempting to justify the defective appointment of Ms. Halligan, however, the government advances a radical theory that would upend this centuries-old framework. The government argues that the Attorney General can erase the Senate's role in the appointments process by naming "interim" U.S. Attorneys to an unlimited succession of 120-day terms. But this boundless interpretation of the Attorney General's power is contrary to the Appointments Clause and at odds with the text, structure, and history of the statutes that govern U.S. Attorney appointments.

Dismissal of this indictment is the only appropriate remedy for Ms. Halligan's unlawful appointment. Though the government seeks to obscure the relevant inquiry, all parties agree that "any *government* attorney can present a case to a grand jury or sign an indictment." Br. 2 (emphasis added). The problem is that when Ms. Halligan presented this case to the grand jury and signed the indictment—entirely on her own—she was not a "government" attorney. Instead, she was a private citizen with no authority to litigate on behalf of the United States. The government attempts to whitewash this fatal defect by pointing to alternative, lawful paths that Attorney General Bondi "could have" taken to install Ms. Halligan as a prosecutor. Br. 26–28. But the Executive Branch cannot retroactively appoint Ms. Halligan to positions she never held. Nor can it ratify this illegitimate indictment or claim that Ms. Halligan—whose purported appointment plainly violated the Appointments Clause—was a "de facto" officer. Attorney General Bondi's attempt to retroactively give Ms. Halligan new titles and to bless the improper

indictment is a telling indication that the government knows Ms. Halligan's actions were unauthorized, null and void.

## ARGUMENT

### I.    THE GOVERNMENT'S THEORY OF SECTION 546 WOULD ELIMINATE THE SENATE'S ROLE IN THE APPOINTMENTS PROCESS.

Reading Section 546 to enable the Attorney General to string together an infinite number of "interim" U.S. Attorney appointments would fully eliminate the Senate's advice-and-consent role in the appointment of U.S. Attorneys. From the Founding, U.S. Attorneys have been appointed through the "default manner of appointment"—by the President with the advice and consent of the Senate. *Edmond v. United States*, 520 U.S. 651, 660 (1997); *see* Judiciary Act of 1789, 1 Stat. 73 § 35; James A. Heilpern, *Interim United States Attorneys*, 28 Geo. Mason L. Rev. 187, 190 (2020). This requirement is codified at 28 U.S.C. § 541(a).

The government now seeks to circumvent the firmly established appointments process by probing for a loophole in a statute that provides for the appointment of *interim* U.S. Attorneys. Under 28 U.S.C. § 546, Congress has provided the Executive Branch with a pathway to temporarily install a U.S. Attorney without Senate confirmation. Section 546 provides that "the Attorney General may appoint a United States attorney for the district in which the office of United States attorney is vacant," and that person may serve until either "(1) the qualification of a United States attorney for such district" under Section 541, "or (2) the expiration of 120 days after appointment by the Attorney General under this section." 28 U.S.C. § 546(c). When an interim U.S. Attorney appointment expires after 120 days, "the district court for such district may appoint a United States attorney to serve until the vacancy is filled." *Id.* § 546(d).

The durational limit on the Attorney General's interim appointment authority under Section 546 is not an empty formality. Instead, it guarantees the role of Section 541 (and therefore, Senate

confirmation) as the exclusive means of appointing a U.S. Attorney.  Congress's 2007 action to affirmatively reinstate the 120-day expiration date on interim appointments—which was motivated by "several instances where the Attorney General made successive interim appointments pursuant to section 546 of either the same or different individuals"—squarely foreclosed the workaround that the government now attempts to exploit.  H.R. Rep. No. 110–58 at 6 (2007).  Section 546 has not changed since the 2007 amendment, and, outside of this Administration, the government does not point to any example of successive interim appointments following the amendment's enactment.

Instead of giving effect to the 2007 amendment, the government's reading of Section 546 would enable the Executive Branch to appoint the President's handpicked U.S. Attorney to serve for an entire presidential term without ever facing Senate confirmation.  The government argues for a profound redistribution of power that Congress expressly rejected, and that this Court cannot accept.

## II.    THE GOVERNMENT'S ANALYSIS OF SECTION 546 IS FUNDAMENTALLY FLAWED.

To support its preferred interpretation of Section 546, the government principally relies on a textual argument that is too clever by half.  The government asserts that because Subsection (b) is the only provision described as an *exception* to the Attorney General's appointment authority under Subsection (a), no other provision can be read to limit the Attorney General's interim appointment power.  *See* Br. 4, 6.  Subsection (a) states that "[e]xcept as provided in [S]ubsection (b)," the Attorney General may appoint an interim U.S. Attorney while the position is vacant.  And Subsection (b), in turn, prohibits the Attorney General from appointing someone whose nomination the Senate rejected.  But to accept the government's premise that an appointment is valid so long as "546(a)'s plain text is satisfied," Br. 1, one would need to stop

reading the statute halfway through. "We do not, however, construe statutory phrases in isolation; we read statutes as a whole." *United States v. Morton*, 467 U.S. 822, 828 (1984).

The remaining provisions of Section 546 expressly delineate an additional constraint on the Attorney General's appointment authority. Subsection (c)(2) establishes that 120 days after the Attorney General invokes Subsection (a), an interim U.S. Attorney appointment expires. And Subsection (d) provides that when such an appointment expires, the *district court* inherits the power to appoint a U.S. Attorney until the position is filled through Senate confirmation. This is an express temporal limitation on the Attorney General's appointment authority, regardless of whether the statute labels it an exception.

In arguing that Subsection (b) is the only *exception* to Subsection (a), the government grounds its textual analysis in a meaningless formalism. The government cannot seriously dispute that the Attorney General's appointment authority is subject to other *limitations* and *restrictions*. As the government tacitly acknowledges, an Attorney General's interim appointment "may not exceed 120 days" under Subsection (c)(2). Br. 1. The government refers to this as an "implied[]" limitation, Br. 1, but that label does not fit. If the Attorney General announced that she had appointed an interim U.S. Attorney to a term of 130 days, such an appointment would be invalid on its face. Subsection (c)(2) thus provides an express constraint on the Attorney General's appointment authority, "exception" or not.

Subsection (c)(2) is not the only additional limitation. Under 28 U.S.C. § 545, the Attorney General cannot appoint as interim U.S. Attorney a person who does not live in the district in which she would serve. And under Section Three of the Fourteenth Amendment, the Attorney General cannot appoint as interim U.S. Attorney a person who previously violated her constitutional oath by engaging in an insurrection or rebellion against the United States. U.S. Const. Amend. 14, § 3.

These provisions impose express limitations on the Attorney General's Subsection (a) authority. By characterizing Subsection (b) as the sole *exception*, the government identifies what is, at most, a distinction without a difference. Contrary to the government's assertion, Subsection (b) is not the "one and only one" restriction on the Attorney General's appointment power. Subsection (c)(2)—which provides that the Attorney General's appointment authority expires after 120 days—is among the additional constraints.

In addition to overlooking Subsection (c)(2), the government's preferred reading of Section 546 is fundamentally incompatible with the text of Subsection (d). By its plain terms, Subsection (d) provides a single option for appointing an interim U.S. Attorney following the expiration of a Subsection (a) appointment: "[I]f an appointment expires . . . *the district court* for such district may appoint a United States attorney to serve until the vacancy is filled." 28 U.S.C. § 546(d) (emphasis added). Under the interpretive canon of *expressio unius*, Subsection (d)'s express mention of the district court—and only the district court—should be read to imply that no other authority may appoint an interim U.S. Attorney upon the expiration of 120 days. *See* A. Scalia & B. Garner, Reading Law: The Interpretation of Legal Texts 111 (2012). The government accuses Attorney General James of reading Subsection (d) to implicitly state that after an interim appointment expires under Subsection (c)(2), "*only* the district court . . . may appoint" an interim United States Attorney. Br. 13. But under the *expressio unius* canon, that is exactly how it is supposed to be read.

It is the government that reads into Subsection (d) words that do not belong. Brushing past the *expressio unius* canon, the government insists that the Attorney General—who Subsection (d) does not mention—has "parallel authority" to name an interim U.S. Attorney following the expiration of the 120-day window. Br. 14. The government thus reads Subsection (d) to provide

that if an appointment expires, "the district court . . . *or the Attorney General* may appoint a United States Attorney." But that is not the statute that Congress wrote. If Subsection (d) intended to recognize the Attorney General's appointment power as a "parallel track," Br. 2, it would have said so.

The Supreme Court's analysis in *United States v. Giordano*, 416 U.S. 505, 513–14 (1974), is instructive. That opinion, which is cited as a textbook example of how to apply the *expressio unius* canon, *see* Scalia & Garner, *supra*, at 111, concerned a statutory provision closely resembling Subsection (d). There, the Court analyzed a provision providing that "(t)he Attorney General, or any Assistant Attorney General specially designated by the Attorney General, may authorize" a wiretap application. *Giordano*, 416 U.S. at 513 (quoting 18 U.S.C. § 2516(1) (1971)). Though the statute identified only two types of officials—the Attorney General and a specially designated Assistant Attorney General—the government in *Giordano* asserted that an additional official, the Attorney General's executive assistant, implicitly possessed parallel authority to authorize a wiretap. *Id.* at 512. The Court rejected that argument. *Id.* at 512–14. It held that because the provision expressly named certain officials, all others were excluded by negative implication. *Id.* Here, the fact that Subsection (d) expressly identifies only the district court carries the same implication. "If an appointment expires [after 120 days] under [S]ubsection (c)(2)," there is no other authority that can appoint an interim U.S. Attorney. 28 U.S.C. § 546(d).

The government's preferred interpretation of Section 546 also flouts the surplusage canon. *See* Scalia & Garner, *supra*, at 174. The government reads Subsection (c) to provide that "[a] person appointed as United States attorney under this section may serve until . . . the expiration of 120 days after [*his or her*] appointment by the Attorney General under this section." 28 U.S.C. § 546(c). But under that interpretation, the provision should stop after the word "appointment."

The phrase "by the Attorney General under this section" in Subsection (c)(2) would be entirely redundant. Under Attorney General James's reading of Subsection (c), however, there is no superfluity.

The government attempts to justify the glitch in its preferred reading of Section 546 by arguing that the phrase "by the Attorney General under this section" serves to "clarif[y] that the 120-day limit governs appointments only under Section 546," and not appointments under Section 541. Br. 9. But no additional language is needed to clarify whether the clause "a person appointed under *this section*," 28 U.S.C. § 546(c) (emphasis added), refers to a person appointed under a *different section*—Section 541. Nor does looking to Subsection (c)(1) help the government explain away the surplusage. The government describes the superfluous language in its interpretation of Subsection (c)(2) as "draw[ing] a contrast" with Subsection (c)(1) and "reorient[ing] the reader." Br. 9. Yet absent an express textual indication—which the phrase "by the Attorney General under this section" is not—it would be strange to assume that Congress intended Subsections (c)(1) and (c)(2) to be read in "contrast." Br. 9. Subsection (c)(1), which provides that the Senate Confirmation of a full-time U.S. Attorney terminates an interim appointment, "is indisputably benchmarked to an event unrelated to any specific person's interim appointment." *United Sates v. Giraud*, 2025 WL 2416737, at *10 (D.N.J. Aug. 21, 2025). There is no indication that Subsection (c)(2) is any different. The government concedes that under Subsection (c)(1), "[o]nce the Senate confirms a U.S. Attorney, the interim officeholder is out, regardless of how long she served or who appointed her." Br. 10. Subsection (c)(2) should be read the same way: Once the clock hits 120 days after the Attorney General's initial appointment, the interim officeholder is out, regardless of how long she served or who appointed her. Subsection (c)(2) is benchmarked to action "by the

Attorney General under this section," just as Subsection (c)(1) is benchmarked to action by Congress. Neither provision is appointee-specific.

Though the government argues that Fourth Circuit precedent supports its preferred reading of Section 546, it relies on a recent case that instead cuts against its expansive theory of the Attorney General's power to appoint U.S. Attorneys. In *Salomon-Guillen v. Garland*, 123 F.4th 709 (4th Cir. 2024), the Fourth Circuit considered the scope of the Attorney General's authority to appoint temporary members to the Board of Immigration Appeals (BIA). Under the relevant regulations, the unilateral authority to appoint *permanent* members of the BIA belonged to the Attorney General. *See* 8 C.F.R. § 1003.1(a)(1). Neither Senate confirmation nor any other mechanism provided a check on the Attorney General's power. *Id.* The appellant argued, however, that there was an implicit constraint on the Attorney General's authority to appoint *temporary* Board members. *Salomon-Guillen*, 123 F.4th at 717. The regulation at issue authorized the appointment of "temporary Board members for *terms not to exceed six months*." 8 C.F.R. § 1003.1(a)(4) (2022) (emphasis added). In the appellant's view, the absence of the word "renewable" before "terms" indicated that the Attorney General could not appoint a temporary Board member to successive terms. The Fourth Circuit rejected this argument, concluding that the regulation's text did not "restrict the [Attorney General's] power to appoint the same person to multiple consecutive terms." *Salomon-Guillen*, 123 F.4th at 717.

*Salomon-Guillen* illuminates two critical differences between temporary BIA appointments and interim U.S. Attorney appointments. First, whereas any potential constraint on the Attorney General's power to appoint temporary BIA members needed to be reconciled with the Attorney General's absolute authority to appoint permanent BIA members, the Attorney General has no authority to appoint a full-fledged U.S. Attorney. *See* 28 U.S.C. § 541. And

second, the regulation at issue in *Salomon-Guillen* imposed a six-month time limitation on "terms," not persons.  8 C.F.R. § 1003.1(a)(4) (2022).  Subsection (c), in contrast, imposes a limit on when "a person . . . may serve."  Further, by using the plural form of the word "term" and referring to "term*s*" of six months, the regulation at issue in *Salomon-Guillen* implied that one could serve for multiple terms.  8 C.F.R. § 1003.1(a)(4) (2022).  Section 546 does not use similar language.  Subsection (c) provides that a person may not serve as interim U.S. Attorney after a 120-day window expires; it does not state that a person may serve "terms" of 120 days.  That is a meaningful distinction.

The government's resort to legislative history is similarly unavailing.  After deriding legislative history as "not the law," Br. 11 (citation omitted), the government employs the worst version of the practice it criticizes: "looking over a crowd and picking out your friends."  Br. 11 (quoting *Exxon Mobil Corp. v. Allapattah Servs., Inc.*, 545 U.S. 546, 568 (2005)).  To support its theory that an Attorney General may make successive interim appointments, the government quotes floor statements from Senator Kyl—the author of an amendment to Section 546 that *failed* to pass.  Br. 11; *see* 153 Cong. Rec. S3302 (March 20, 2007).  But "floor statements by individual legislators rank among the least illuminating forms of legislative history."  *N.L.R.B. v. SW Gen., Inc.*, 580 U.S. 288, 307 (2017).  And though Senator Kyl feared that Section 546 allowed the Attorney General to make more than one interim appointment, the majority that rejected his amendment and voted to pass the 2007 bill did not share his interpretation.  Senator Feinstein, the architect of the legislation that *did* pass, stated that the bill would "give the Attorney General the authority to appoint interim U.S. attorneys, but it would limit that authority to 120 days.  If after that time the President had not nominated a new U.S. [A]ttorney or the Senate had not confirmed a nominee, then the district courts would appoint an interim U.S. attorney."  153 Cong. Rec. S3298

(March 20, 2007).  And the House Report on the 2007 amendment—a far more reliable source of legislative history than the statement of any individual legislator—stated that the amendment was motivated by concerns about the Executive Branch "Bypassing the Requirement of Senatorial Advice and Consent," emphasizing "several instances where the Attorney General made successive interim appointments pursuant to section 546 of either the same or different individuals." H.R. Rep. No. 110-58, at 6 (2007).  Resort to legislative history is unnecessary given that the plain text of Section 546 squarely forecloses the government's radical reading of Section 546, but the legislative history weighs heavily in favor of Attorney General James's position.

Nor does historical practice within the Executive Branch support the government's position.  The government argues that because the Executive Branch has previously attempted to make multiple interim appointments under Section 546, the practice must be permissible.  In support of this argument, the government points to one example of a successive interim appointment in 1987, Br. 10, and cites a 2008 report from the Congressional Research Service stating that "between January 1993 and March 9, 2006, at least eight U.S. Attorney vacancies—three under the Clinton Administration and five under the Bush Administration—were filled through successive 120-day appointments by the Attorney General under the provisions of 28 U.S.C. § 546." Henry B. Hogue, Cong. Rsch. Serv., RS21412, *Temporarily Filling Presidentially Appointed, Senate-Confirmed Positions* at 6 n.23 (Jan. 25, 2008).

Citing nine examples over two decades is not strong evidence of historical practice.  Though a "systematic, unbroken, executive practice, long pursued to the knowledge of Congress and never before questioned" may be evidence of a statute's meaning, *Medellín v. Texas*, 552 U.S. 491, 531 (2008) (quoting *Dames & Moore v. Regan*, 453 U.S. 654, 686 (1981)), that is not what the government provides.  Instead, it offers only a handful of anecdotes among hundreds of interim

U.S. Attorney appointments. This is precisely the type of evidence that the Supreme Court rejected in *Southwest General*. *See* 580 U.S. at 308 ("'[H]istorical practice' is too grand a title for the Board's evidence . . . the 112 nominations that the Board cites make up less than two percent of the thousands of nominations . . . ."). The only difference here is that the government cites nine examples rather than 112. And critically, the government does not point to *any* instance of successive interim appointments following the statute's 2007 amendment. In the 18 years since Congress amended Section 546 to install guardrails on the Attorney General's appointment authority, the government cannot find a single instance of the practice it asks this Court to bless.

The more relevant evidence of the Executive Branch's historical understanding of Section 546 squarely refutes the government's preferred interpretation. Just three days after Congress enacted the 1986 law, the Office of Legal Counsel (OLC) issued an opinion, authored by then-Deputy Assistant Attorney General Samuel Alito, that contradicts the interpretation that the government now maintains.[1] OLC concluded that while a "vacancy exists when the 120-day period expires under the amended section 546 and the President has either not made an appointment or the appointment has not been confirmed," "it *does not follow* that the Attorney General may make another appointment pursuant to 28 U.S.C. § 546(a) after the expiration of the 120-day period." *Id*. at 2 (emphasis added). Then-Deputy Assistant Attorney General Alito reasoned that "[t]he statutory plan discloses a Congressional purpose that after the expiration of the 120-day period further interim appointments are to be made by the court rather than by the Attorney General." *Id.* at 3. This "contemporaneous[]" Executive Branch interpretation provides persuasive evidence of statutory meaning. *Loper Bright Enterprises v. Raimondo*, 603 U.S. 369,

---

[1] *See Definition of Vacancy for the Purpose of Interim Appointment of United States Attorneys pursuant to 28 U.S.C. 546, as amended*, Office of Legal Counsel (Nov. 13, 1986), https://perma.cc/SD5Q-7CPH.

386 (2024).  The government accuses then-Deputy Assistant Attorney General Alito of relying on a Congressional floor statement that "does not even suggest" support for the his ultimate conclusion, Br. 12, and it denigrates the memo's reasoning as "consistent with the era in which it was written."  Br 12.  But the government has provided no evidence that OLC ever changed its position in the subsequent forty years until this Administration.

The government's characterization of Subsection (d) as a "fallback option," Br. 4, is entirely inconsistent with the way that this Administration has operated.  Neither this Administration nor any other has treated Subsection (d) as a "fallback" that comes into play only when "the Attorney General fails to act" after an interim appointment expires.  Br. 4.  Consider Mr. Siebert's appointment.  Approximately two weeks *before* Mr. Siebert's 546(a) appointment expired, the district court—pursuant to Subsection (d)—unanimously appointed Mr. Siebert to continue in his role as interim U.S. attorney.[2]  The district court did not wait to see whether the Attorney General would act, nor did the Attorney General try to preempt the district court by announcing in advance that she would appoint Mr. Siebert to a second 120-day term.  The same is true of other interim U.S. Attorney appointments throughout the country, including in the Southern District of New York:  Before Jay Clayton's 120-day term expired, the district court issued an order providing for his reappointment.[3]  And in the District of New Jersey, the Attorney General attempted to extend Alina Habba's term as U.S. Attorney only *after* it failed to convince the district

---

[2] United States District Court for the Eastern District of Virginia, *Appointment of Erik S. Siebert as Interim U.S. Attorney Effective May 21, 2025* (May 9, 2025), https://www.vaed.uscourts.gov/news/appointment-erik-s-siebert-interim-us-attorney-effective-may-21-2025.

[3] *See* Benjamin Weiser, *Manhattan Judges Approve Trump's Choice for U.S. Attorney*, N.Y. Times (Aug. 18, 2025), https://www.nytimes.com/2025/08/18/nyregion/jay-clayton-us-attorney-manhattan-trump.html.

court to reappoint her upon the expiration of her interim term.[4] This administration's own conduct belies the assertion that it views Subsection (d) as a "fallback option."  Br. 4.

Nor does the history of Subsection (d) support the notion that Congress intended it to serve only as a "fallback."  Br. 4.  Until 1986, the district court had *exclusive* authority to appoint an interim U.S. Attorney.  The pre-1986-amendment version of the statute read: "The district court for a district in which the office of United States attorney is vacant, may appoint a United States attorney to serve until the vacancy is filled. The order of appointment by the court shall be filed with the clerk of the court."  Act of June 25, 1948, ch. 646, § 1, 62 Stat. 909.  When Congress amended the statute in 1986 and added Subsection (a) to provide certain authority to the Attorney General, it did not eliminate the district court's role in the interim U.S. Attorney appointment process.  It merely gave the Attorney General the limited authority to choose an interim U.S. Attorney for 120 days, after which control remained in the hands of the district court.  Except for the ill-fated 2006 amendment that lasted less than a year, that scheme has not changed.  The interpretation of Subsection (d) that the government now advances is squarely at odds with the statute's history.  This Court cannot accept a theory of Section 546 that is contrary to the text, context, and historical understanding of every relevant provision.

## III. DISMISSAL OF THIS DEFECTIVE INDICTMENT IS THE ONLY PROPER REMEDY.

Because this indictment violates both the Appointments Clause and Section 546, the Court must dismiss this case.  After Attorney General James filed this motion to dismiss, Attorney General Bondi undertook a series of novel maneuvers to attempt to clean up the mess of Ms. Halligan's unlawful interim appointment.  *See* Gov't Ex. A, ECF No. 43-1 (Oct. 31, 2025

---

[4] *See* Joey Fox, *Deputy AG accuses judges of 'act[ing] like activists' in bypassing Habba*, N.J. Globe (July 22, 2025, 2:53 PM), https://newjerseyglobe.com/judiciary/deputy-ag-accuses-judges-of-acting-like-activists-in-bypassing-habba/.

Appointment and Ratification Order). But Attorney General Bondi does not have a time machine. None of Attorney General Bondi's actions change the fact that when Ms. Halligan brought this indictment before the grand jury, apparently entirely on her own, she was not a government attorney. Attorney General Bondi could not, on October 31, 2025, appoint Ms. Halligan to a new prosecutorial position effective September 22, 2025. The government cannot point to any case indicating that so long as the government allegedly "*intended*" to vest the relevant official with the proper authority, an invalid appointment can be excused. Br. 21. It is what the Attorney General did, not what was in her mind, that determines whether the appointment was proper. All parties agree that "any *government* attorney can present a case to a grand jury or sign an indictment." Gov't Br. 2 (emphasis added). The problem is that Ms. Halligan brought this indictment as a private citizen with no authority to litigate on behalf of the United States. No amount of ex-post maneuvering can rescue this unlawful indictment from dismissal.

The government attacks a strawman in arguing that "the improper signing of an indictment" is a "technical deficiency" that does not require the indictment's dismissal. Br. 21. No one contends that the improper appearance of Ms. Halligan's signature would, without more, invalidate an indictment. Rather, the fatal flaw in this indictment is that Ms. Halligan—as a private citizen— was the only individual to *present this case to the grand jury* and sign the indictment. That fact requires dismissal.

Because Ms. Halligan was the only individual to participate in securing this indictment, the Court lacks jurisdiction to hear this case. This case is entirely distinguishable from *United States v. Kelley*, 404 F. Supp. 3d 447, 450 (D. Mass. 2019), *aff'd*, 989 F.3d 67 (1st Cir. 2021). The government represents *Kelley* as a case in which the district court held that an indictment was valid—even though it was signed by only an improper attorney—because other government

lawyers' "signatures on later filings" evidenced that the government supported the prosecution. Br. 22. But in *Kelley*, the relevant evidence was that multiple government attorneys approved the indictment *before* it was signed, not that they expressed approval via "later filings," Br. 22. *See Kelley*, 404 F. Supp. 3d at 453. And in *Kelley*, the U.S. Attorney overseeing the office in question stated that, in his office, "the decision to prosecute is . . . made by a number of people and AUSAs at all times act under the direction of a supervisory AUSA." *Kelley*, 404 F. Supp. 3d at 450. The court's inquiry in *Kelley* concerned whether other government attorneys supervised and approved the indictment before it issued, not whether, weeks later, government attorneys indicated that they approved *of* the indictment. The other cases that the government characterizes as "confirm[ing] the validity of these indictments," Br. 22, involve similar circumstances. In each case, the court found that it possessed jurisdiction because there was evidence that other government attorneys supervised and approved the indictment *before* it issued. *See United States v. Bennett*, 464 F. App'x 183, 185 (4th Cir. 2012); *Woods v. United States*, 2010 WL 4746138, *2 (M.D.N.C. Nov. 16, 2010); *Parker v. United States*, 2006 WL 2597770, at *15 (E.D. Ark. Sept. 8, 2006). Though the government argues that elements of this case are distinguishable from *United States v. Providence Journal Co.*, 485 U.S. 693 (1988), Br. 22, the fact that the government in *Providence Journal* never approved of the improper prosecutor's conduct does not establish that those circumstances are the only ones in which a court lacks jurisdiction. Br. 22. The government mistakes a sufficient condition for a necessary one.

Similarly unconvincing is the government's attempt, via footnote, to minimize *United States v. Durham*, 941 F.2d 886, 891–92 (9th Cir. 1991). In *Durham*, the Ninth Circuit "was unable to determine whether the district court had jurisdiction" because, in the Ninth Circuit's view, certain evidence that the improper prosecutor "may have been the only prosecutor in

15

attendance presenting the case . . . to the grand jury" was enough to "call into question whether [the improper prosecutor] was operating under the direction and supervision of the United States Attorney." *Id.* at 892.  The plain implication of the Ninth Circuit's analysis is that if the improper prosecutor had been acting without supervision when he secured the indictment, the district court would lack jurisdiction.  Here, the fact that the Attorney General purportedly "ratified" the indictment three weeks later provides no evidence that Ms. Halligan was supervised when she walked into the grand jury room on October 9.  The DOJ in *Durham* of course approved of the indictment after it was returned—that is why it was defending the conviction on appeal.  But this was not the relevant question.

In faulting Attorney General James for "try[ing] to bootstrap" a Section 546 violation into a violation of the Appointments Clause, the government betrays a fundamental misunderstanding of how the two provisions relate.  The government again attempts to slay a strawman in emphasizing that "not every action in excess of statutory authority is *ipso facto* in violation of the Constitution."  Br. 23 (citation omitted).  That is not what Attorney General James argues. Attorney General James's theory of a constitutional violation is grounded in the plain text of the Appointments Clause and does not, as the government mistakenly claims, provide that "every statutory violation would become a constitutional violation."  Br. 23 (emphasis omitted). The Appointments Clause dictates that inferior officers like U.S. Attorneys can be appointed only 1) by the President "with the Advice and Consent of the Senate," or 2) through a process that Congress has properly authorized "by Law."  An appointment that comports with neither of these pathways violates the Appointments Clause.  In *United States v. Trump*, 740 F. Supp. 3d 1245, 1304 (S.D. Fla. 2024), the district court recognized that if an inferior office is appointed in a manner that does not comply with any statute, her appointment violates the Appointments Clause.

The government contends that Attorney General James's theory of Appointments Clause violations is too broad, but tellingly, it does not argue that *Trump* was incorrectly decided.

Because Ms. Halligan's appointment is unconstitutional, her work "cannot be salvaged by the *de facto* officer doctrine." *Trump*, 740 F. Supp. 3d at 1303. "'[O]ne who makes a timely challenge to the constitutional validity of the appointment of an officer . . . ' is entitled to relief." *Lucia v. SEC*, 585 U.S. 237, 251 (2018) (quoting *Ryder v. United States*, 515 U.S. 177, 182–83 (1995). As the Supreme Court has recognized, in cases that involve a "[g]overnment actor's exercise of power that the actor did not lawfully possess," the proper remedy is invalidation of the *ultra vires* action. *Collins v. Yellen*, 594 U.S. 220, 258 (2021). Invalidation of the action "follows directly from the government actor's lack of authority to take the challenged action in the first place. That is, winning the merits of the constitutional challenge is enough." *Consumer Fin. Prot. Bureau v. All Am. Check Cashing, Inc.*, 33 F.4th 218, 241 (5th Cir. 2022) (Jones, J., concurring).

The government does not cite a single case in which a court has accepted a prosecutor's attempt to "ratify" an unlawful indictment. "Ratification is a doctrine derived from agency law," *Wille v. Lutnick*, No. 24-1734, 2025 WL 3039191, at *3 (4th Cir. Oct. 31, 2025), and the government fails to explain why this doctrine should apply in the criminal context. The "safeguards which surround an accused in a criminal prosecution . . . create wide differences between the bundle of legal principles which govern a criminal trial and those which apply to a civil suit." *Neaderland v. Comm'r*, 424 F.2d 639, 643 (2d Cir. 1970) (citation omitted); *see Gun Owners of Am., Inc. v. Garland*, 19 F.4th 890, 902 (6th Cir. 2021) (Opinion of White, J.) ("No one contests that criminal law and procedure afford special protections to a criminal defendant that are not accorded to a civil defendant."). The remedies provided in civil Appointments Clause cases constitute a floor, not a ceiling. Further, the Fourth Circuit case the government cites concerns an

attempt to ratify an action undertaken by an official who was, without question, a valid government employee. *See Lutnick*, No. 24-1734, 2025 WL 3039191, at *2. The government provides no support for the notion that it can ratify the actions of private citizens such as Ms. Halligan.

The government argues that Attorney General James's request for an injunction has been "overtaken by events." Br. 30. But none of those "events" cure the constitutional violation or render Ms. Halligan eligible to supervise this prosecution. The Attorney General's attempt to fix Ms. Halligan's appointment is invalid on its face. *See* Gov't Ex. A, ECF No. 43-1. On October 31, 2025, the Attorney General had no power to appoint Ms. Halligan to new prosecutorial position "as of September 22, 2025." *Id.* Just as President Trump could not announce tomorrow that he is "appointing" Attorney General Bondi as the acting Administrator of NASA from January 2025 to March 2025, Attorney General Bondi lacked the power announce an appointment of Ms. Halligan that bent space and time. To this date, Ms. Halligan has not been properly appointed to any prosecutorial position that saves the illegitimate indictment or allows her to supervise this case as illegally brought.

Because Ms. Halligan's unlawful appointment fundamentally tainted the structural integrity of the grand jury process, this is a case where the harmless-error inquiry does not apply. *See Bank of Nova Scotia v. United States*, 487 U.S. 250, 257 (1988) (collecting cases and concluding that the presumption of prejudice applies where "the structural protections the structural protections of the grand jury have been so compromised as to render the proceedings fundamentally unfair"). But if this Court did evaluate the prejudicial impact of Ms. Halligan's improper involvement in this prosecution, it would conclude that the government cannot sustain its "burden of showing harmlessness" under Federal Rule of Criminal Procedure 52(a). *United States v. Davila*, 569 U.S. 597, 607 (2013). "Before a federal constitutional error can be held

18

harmless, the court must be able to declare a belief that it was harmless beyond a reasonable doubt." *Chapman v. California*, 386 U.S. 18, 24 (1967).  Here, the circumstances surrounding the indictment make clear that *but for* Ms. Halligan's improper appointment as interim U.S. Attorney, Attorney General James's indictment would not have even been presented to a grand jury. President Trump publicly asked the Attorney General to appoint Ms. Halligan (which she ultimately did unlawfully) because he seemingly believed that under Mr. Siebert, "nothing is going to be done" about "Letitia"—*i.e.*, Attorney General James—and others who had targeted him and were, in the President's view, "guilty as hell."[5]  The President's own public statements indicate that the grand jury proceeding would not have occurred absent Ms. Halligan's unlawful appointment.

Finally, the indictment should be dismissed with prejudice.  That is the only remedy that will promote the interests protected by the Appointments Clause and deter the government from deploying unlawful appointments to effectuate retaliation against perceived political opponents. In contrast, dismissal without prejudice will reward the government for its willful violation of Section 546 by allowing it to seek reindictment.   And dismissal without prejudice would improperly empower the government to use the "threat of re-indictment" to "exercis[e] leverage over an elected official."  *United States v. Adams*, 777 F. Supp. 3d 185, 218 (S.D.N.Y. 2025) (dismissing with prejudice to avoid similar concern).  The government has already attempted to exercise similar leverage in this case:  Ed Martin, the head of the DOJ's "Weaponization Working Group," sent Attorney General James's counsel a letter pressuring her to "resign from office" because, in his view, it "would best serve the good of the state and nation."  *See* James Ex. G, ECF

---

[5] Betsey Klein, *Trump calls on Attorney General Bondi to use power of the Justice Department more aggressively*, CNN (Sept. 20, 2025), https://www.cnn.com/2025/09/20/politics/trump-justice-department-pam-bondi.

No. 53-7 at 1 (Aug. 12, 2025 letter from E. Martin to A. Lowell).  Mr. Martin stated that if Attorney General James resigned, he would "take this as an act of good faith."  *Id.*  Indeed, if the indictment were dismissed without prejudice, Attorney General James "would be prejudiced by having 'to wait in a state of uncertainty and under public obloquy for an indefinite period of time.'"  *Adams*, 777 F. Supp. 3d at 218 (citation omitted).  This case calls out for an exercise of the Court's "supervisory power" to "deter" the government's "illegal conduct."  *United States v. Hasting*, 461 U.S. 499, 505 (1983).

Contrary to the government's suggestion (at 29), the unlawful appointment here stems directly from the President's vindictive targeting of Attorney General James.  And Attorney General Bondi's appointment itself willfully flouted a 39-year-old OLC memorandum.  Nor can the government plausibly suggest that Attorney General James "suffered no prejudice," *id.*: Absent the unlawful appointment, Ms. Halligan would have been barred from entering the grand jury room.  The Court should reject the government's "counterfactual" speculation that it could have appointed Ms. Halligan a different way, *id.*, and require the government to follow the law *before* seeking to deprive individuals of liberty.

## CONCLUSION

For the foregoing reasons, this Court should dismiss the indictment and enjoin Ms. Halligan from participating in the prosecution of this case.

Dated: November 10, 2025                     Respectfully submitted,


/s/ Abbe David Lowell                         /s/ Andrew Bosse
Abbe David Lowell (*admitted pro hac vice*)   Andrew Bosse (VSB No. 98616)
David A. Kolansky (*admitted pro hac vice*)   BAUGHMAN KROUP BOSSE PLLC
Isabella M. Oishi (*admitted pro hac vice*)   500 E. Main Street, Suite 1400
Schuyler Standley (*admitted pro hac vice*)   Norfolk, VA 23510
John P. Bolen (*admitted pro hac vice*)       Tel: (757) 916-5771

LOWELL & ASSOCIATES, PLLC                    ABosse@bkbfirm.com
1250 H Street NW, Suite 250
Washington, DC 20005
Tel: 202-964-6110
Fax: 202-964-6116
ALowellpublicoutreach@lowellandassociates.com
DKolansky@lowellandassociates.com
IOishi@lowellandassociates.com

*Counsel for Letitia A. James*