## UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF VIRGINIA

| | |
|---|---|
| **UNITED STATES OF AMERICA,**<br><br>v.<br><br>**LETITIA A. JAMES,**<br><br>*Defendant.* | **No. 2:25-CR-122 (JKW)** |

**BRIEF OF FORMER SENIOR OFFICIALS OF THE DEPARTMENT OF JUSTICE AS *AMICI CURIAE* IN SUPPORT OF DEFENDANT'S MOTION TO DISMISS INDICTMENT FOR VINDICTIVE PROSECUTION**

GREGORY P. ROSEN (VA Bar # 82584)
ROGERS JOSEPH O'DONNELL PC
1500 K Street N.W., Suite 800
Washington, D.C. 20005
(202) 777-8952
grosen@rjo.com

MARY L. DOHRMANN††*
JAMES I. PEARCE†*
WASHINGTON LITIGATION GROUP
1717 K Street N.W., Suite 1120
Washington, D.C. 20006
(202) 521-8750
mdohrmann@washingtonlitigationgroup.org
jpearce@washingtonlitigationgroup.org

† Admitted only in New York and North Carolina; practicing under the supervision of D.C. Bar Members
†† Admitted only in New York; practicing under the supervision of D.C. Bar Members
* Pending motion for admission *pro hac vice*

*Counsel for Amici Curiae*
*Former Senior Officials of the*
*Department of Justice*

## TABLE OF CONTENTS

INTEREST OF *AMICI CURIAE* ................................................................................... 1

INTRODUCTION AND SUMMARY OF ARGUMENT ................................................. 2

ARGUMENT ................................................................................................................... 6

I.    The Department of Justice's longstanding policies are designed to ensure that criminal prosecutions are impartial and fundamentally fair .................................................. 6

II.   Vindictively motivated and biased prosecutions violate not only the Department's obligation to pursue justice, but also the Constitution's guarantee of due process. ............ 15

    A.   The Due Process Clause forbids vindictive prosecutions that are motivated by retributive animus. ................................................................................................................... 16

    B.   The Due Process Clause requires an impartial prosecutor, free from bias or conflicts of interest ...................................................................................................................... 18

III.  As a product of vindictive animus, rather than the fair-minded judgment of an impartial prosecutor, this indictment does not comport with the Due Process Clause. ...................... 20

IV.   Relief is merited in this case and will deter any similar future abuses of prosecutorial power ......................................................................................................................... 25

CONCLUSION ............................................................................................................... 26

APPENDIX: *AMICI CURIAE* .......................................................................................... i

**TABLE OF AUTHORITIES**

Page(s)

CASES

*Bauers v. Heisel*
    361 F.2d 581, 590 (3d Cir. 1966) ............................................................................................ 19

*Berger v. United States*,
    295 U.S. 78 (1935) ...................................................................................................... 7, 18

*Blackledge v. Perry*,
    417 U.S. 21 (1974) ......................................................................................................... 16

*Bordenkircher v. Hayes*,
    434 U.S. 357 (1978) ......................................................................................... 5, 16, 17, 21

*Branzburg v. Hayes*,
    408 U.S. 665 (1972) ......................................................................................................... 9

*Ewing v. Mytinger & Casselberry*,
    339 U.S. 594 (1950) ......................................................................................................... 7

*Ganger v. Peyton*,
    379 F.2d 709 (4th Cir. 1967) ......................................................................... 15, 19, 23, 24

*Jones v. Richards*,
    776 F.2d 1244 (4th Cir. 1985) .............................................................................. 5, 19, 24

*Morrison v. Olson*,
    487 U.S. 654 (1988) (Scalia, J., dissenting) ............................................................................ 6

*Nat'l Rifle Ass'n v. Vullo*,
    602 U.S. 175 (2024) ......................................................................................................... 21

*North Carolina v. Pearce*,
    395 U.S. 711 (1969 ...................................................................................................... 16, 17

*Oyler v. Boles*,
    368 U.S. 448 (1962) ......................................................................................................... 10

*United States v. Abrego Garcia*,
    No. 3:25-cr-00115, -- F. Supp. 3d --, 2025 WL 2814712 (M.D. Tenn. Oct. 3,
    2025) ...................................................................................................................... 18

*United States v. Adams*,
    870 F.2d 1140 (6th Cir. 1989) ...................................................................................... 25

*United States v. Andrews,*
    633 F.2d 449 (6th Cir. 1980) ..........................................................................21

*United States v. Armstrong,*
    517 U.S. 456 (1996) ...................................................................................6, 10

*United States v. Ball,*
    18 F.4th 445 (4th Cir. 2021) ....................................................................16, 21

*United States v. Batchelder,*
    442 U.S. 114 (1979) .........................................................................................6

*United States v. Bucci,*
    582 F.3d 108 (1st Cir. 2009) ..........................................................................17

*United States v. Caldwell,*
    581 F. Supp. 3d 1 (D.D.C. 2021) ..................................................................13

*United States v. Chem. Found., Inc.,*
    272 U.S. 1 (1967) ...........................................................................................10

*See United States v. James B. Comey, Jr.,*
    No. 1:25-CR-272, Dkt. 1 (E.D. Va.) (Sept. 25, 2025) ..................................25

*United States v. Fiel,*
    35 F.3d 997 (4th Cir. 1994) ...........................................................................17

*United States v. Goodwin,*
    457 U.S. 368 (1982) ..........................................................................17, 20, 21

*United States v. Jackson,*
    327 F.3d 273 (4th Cir. 2003) ............................................................21, 23, 25

*United States v. Jenkins,*
    504 F.3d 694 (9th Cir. 2007) ..........................................................................25

*United States v. Johnson,*
    171 F.3d 139 (2d Cir. 1999)............................................................................21

*United States v. Mosley,*
    64 F.3d 907 (4th Cir. 1995) ...........................................................................17

*United States v. Myung S. Koh,*
    199 F.3d 632 (2d Cir. 1999)......................................................................17, 22

*United States v. P.H.E., Inc.,*
    965 F.2d 848 (10th Cir. 1992) .......................................................................17

*United States v. Sanders,*
    211 F.3d 711 (2d Cir. 2000) ........................................................................................ 16, 17

*United States v. Velsicol Chem. Corp.,*
    498 F. Supp. 1255 (D.D.C. 1980) ........................................................................................ 22

*United States v. Villa,*
    70 F.4th 704 (4th Cir. 2023) ........................................................................................ 21

*United States v. Wilson,*
    262 F.3d 305 (4th Cir. 2001) ........................................................................ 17, 20, 22, 25

*Young v. United States ex rel. Vuitton et Fils S.A.,*
    481 U.S. 787 (1987) .................................................................................................. *passim*

## CONSTITUTION, RULES, AND STATUTES

U.S. Constitution:
    Article II ........................................................................................................................ 24
    Amendment V ................................................................................................................ 15

5 U.S.C § 735 ........................................................................................................................ 11

18 U.S.C §§ 202-209 ............................................................................................................ 10

28 § 541(c) ............................................................................................................................ 22

American Bar Association, Model Rules of Prof. Conduct, Rule 3.8 .......................................... 11

Florida Rules of Prof. Conduct, Rule 4-3.8 ............................................................................ 11

Virginia Rules of Prof. Conduct, Rule 3.8 ................................................................................ 11

## MISCELLANEOUS GOVERNMENT DOCUMENTS

Department of Justice, Criminal Resource Manual (1997) ........................................................ 13

Department of Justice, Ethics Handbook for On and Off-Duty Conduct (Nov.
    2024) ........................................................................................................................ 10

Department of Justice, Justice Manual (Feb. 2024) .............................................................. *passim*

Robert H. Jackson, Attorney General of the United States, *The Federal
Prosecutor*, Address Delivered at the Second Annual Conference of United
    States Attorneys (Apr. 1, 1940) ................................................................................ *passim*

*Removing Politics from the Administration of Justice: Hearings on S. 2803 and S. 2978 Before the S. Comm. on the Judiciary*, 93rd Cong. 202 (1974) (statement of Hon. Theodore Sorenson) ..................................................................7

### NEWS ARTICLES AND MISCELLANEOUS OTHER PUBLICATIONS

BBC News, *Watch: Trump Says 'There Will Be Others' After Comey Indictment*, (Sept. 26, 2025)..................................................................................25

Anna Bower, *Anna, Lindsey Halligan Here*, LAWFARE (Oct. 20, 2025) ......................................23

Katherine Faulders, et al., *Evidence Appears to Undercut Claims Against Letitia James, Prosecutors Found: Sources*, ABC NEWS (Oct. 23, 2025) ..........................22

Andrew Kent, *Congress and the Independence of Federal Law Enforcement*, 52 U.C. Davis L. Rev. 1927, 1934 (2019) ..................................................................7

Scott MacFarlane, *Trump Admin. Fires 2 Prosecutors Who Opposed Charges Against N.Y. Attorney General Letitia James, Source Says*, CBS NEWS (Oct. 20, 2025) ..................................................................................4

Dan Mangan & Kevin Breuninger, *Letitia James Indicted After Trump Called for Charges Against New York AG*, CNBC (updated Oct. 10, 2025) ..............................................4

Ivan Pereira, *Letitia James, Trump Feud Has Been Building Up Since 1st Administration*, ABC NEWS (Oct. 9, 2025) ..................................................................3

Taylor Robinson, *A Timeline of the Conflict Between Letitia James and Donald Trump*, N.Y. TIMES (Oct. 9, 2025) ..................................................................3

Jeremy Roebuck, Perry Stein, & Salvador Rizzo, *Trump Demands Bondi Prosecute Political Foes in Truth Social Posts*, Washington Post (updated Sept. 20, 2025)..................................................................................4

Jessica A. Roth, *Prosecutorial Declination Statements*, 110 J. Crim. & Criminology 477, 490 (2020) ..................................................................13

Glenn Thrush et al., *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From President*, N.Y. TIMES (Sept. 19, 2025)..............................................3

Donald J. Trump (@realDonaldTrump), *Pam: I have reviewed . . . .* Truth Social (Sept. 20, 2025, 6:44 pm)..................................................................4, 21

*Trump Taps Aide to Replace US Attorney in Virginia's Eastern District*, THE ASSOCIATED PRESS (Sept. 21, 2025) ..................................................................3

Kristen Welker & Rebecca Shabad, *Trump Accidentally Posted Message Pressuring Pam Bondi to Charge His Enemies, Source Says*, NBC News (Oct. 10, 2025) ...................................................................................................................4

## INTEREST OF *AMICI CURIAE*

The prosecutor has more control over life, liberty, and reputation than any other person in America.  While the prosecutor at his best is one of the most beneficent forces in our society, when he acts from malice or other base motives, he is one of the worst . . . .

Therein is the most dangerous power of the prosecutor: that he will pick people he thinks he should get, rather than pick cases that need to be prosecuted . . . .

[T]he citizen's safety lies in the prosecutor who . . . seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humility.

Robert H. Jackson, Attorney General of the United States, *The Federal Prosecutor*, at 1, 4, 7, Address Delivered at the Second Annual Conference of United States Attorneys (Apr. 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

\* \* \*

Amici curiae ("Amici") are more than 100 former senior officials of the Department of Justice, who served the government and the people of the United States in both Democratic and Republican administrations.  Amici include former Attorneys General, Deputy Attorneys General, Solicitors General, Deputy Solicitors General, Assistant Attorneys General, Associate Attorneys General, and Deputy Assistant Attorneys General, among others.  Amici also include former United States Attorneys from over 40 different Districts nationwide, including this District.[1]  Collectively, Amici have worked in senior leadership positions within the Department of Justice

---

[1] A complete list of signatories can be found in the Appendix.  Amici state that no counsel for a party to this case authored this brief in whole or in part; no party or counsel for a party contributed monetarily to the preparation or submission of any portion of this brief; and no person other than counsel for Amici contributed money that was intended to fund preparing or submitting the brief.

Amici have concurrently filed a motion seeking the Court's leave to file this brief.  Defendant Letitia James consents to Amici's filing of this brief.  The government has represented that it opposes the motion to file this brief, but government counsel provided no explanation for that opposition.

1

in the Administrations of ten Presidents from both major political parties, dating back to the Nixon Administration.

During their time in public service, Amici lived by the ethos of fairness and impartiality embodied in then-Attorney General Robert H. Jackson's famous speech about the powers of the federal prosecutor. In carrying out their respective responsibilities, Amici were mindful that they served the United States and its citizens—not any particular politician or political party, and certainly not the personal animus of any Executive Branch official. And although Amici may hold divergent viewpoints in many other respects, they are united in their commitment to the importance of fair-minded and apolitical prosecution.

Guided by those fundamental principles and their own experiences as Department of Justice attorneys and public servants, Amici write to provide this Court with their views regarding the dangerous exercise of prosecutorial power in this case.

Based on all publicly available evidence, the indictment of this defendant appears to have been the product not of the neutral judgment of an impartial prosecutor, but rather an expression of retributive animus by the President, acting through an interim United States Attorney whom he personally selected to bring charges against his perceived political foes. Amici harbor grave concerns that if left undisturbed, vindictively motivated prosecutions like this one will threaten core due process protections, undermine the rule of law, inspire further abuses of prosecutorial authority, and ultimately erode the public's respect and faith in the nation's criminal justice system.

## INTRODUCTION AND SUMMARY OF ARGUMENT

The United States Department of Justice ("Department") wields formidable prosecutorial power within the federal system, ultimately encompassing the authority to call on the government's coercive power to deprive persons of liberty. That authority is appropriately

2

entrusted not to partisans, but to stewards of justice, who are bound by the Constitution and other legal and ethical guardrails. As alumni who served in senior positions within the Department, Amici hold steadfast to the bedrock notion that it is the job of the federal prosecutor to seek justice, without fear or favor.

That concept is neither novel nor obscure, but the circumstances surrounding this case reflect a disturbing departure from that venerable principle. The defendant, Letitia James, has been the subject of years of public attacks by the President, based both on James's speech while campaigning for the office of New York's Attorney General, and also on the civil investigations and lawsuits that she brought against the President and his family business while serving in that role.[2] The President has repeatedly called for James's prosecution, but public reports indicate that the previous interim United States Attorney for this District, Erik Siebert, declined to pursue criminal charges, following recommendations from career prosecutors.[3] The President then pressured that United States Attorney to resign, paving the way for the contested appointment of his own former personal lawyer, Lindsey Halligan, to that position.[4]

---

[2] *See, e.g.*, Taylor Robinson, *A Timeline of the Conflict Between Letitia James and Donald Trump*, N.Y. TIMES (Oct. 9, 2025), https://www.nytimes.com/2025/10/09/us/politics/letitia-james-trump-conflict-timeline.html.

[3] *See* Ivan Pereira, *Letitia James, Trump Feud Has Been Building Up Since 1st Administration*, ABC NEWS (Oct. 9, 2025), https://abcnews.go.com/amp/Politics/letitia-james-trump-feud-building-1st-administration/story?id=126381146; Glenn Thrush et al., *U.S. Attorney Investigating Two Trump Foes Departs Amid Pressure From President*, N.Y. TIMES (Sept. 19, 2025), https://www.nytimes.com/2025/09/19/us/politics/erik-siebert-comey-letitia-james.html.

[4] *See Trump Taps Aide to Replace US Attorney in Virginia's Eastern District*, THE ASSOCIATED PRESS (Sept. 21, 2025), https://www.vpm.org/news/2025-09-21/trump-us-attorney-eastern-district-va-erik-siebert-lindsey-halligan.

Meanwhile, in a social media post dated September 20, 2025, and directed personally to the Attorney General,[5] the President wrote that James—along with two other individuals about whom the President similarly expressed animus (one of whom, James Comey, was also recently indicted in this District)—was "guilty as hell" and stated: "We can't delay any longer, it's killing our reputation and credibility. . . . JUSTICE MUST BE SERVED, NOW!!!"[6] Less than three weeks later, Halligan personally presented and secured the indictment in this case.[7] And approximately one week after that, two career prosecutors from this District who had reportedly recommended against charging James were terminated.[8]

This striking sequence of events is unlike anything Amici ever witnessed during their many collective years of service within the Department of Justice. And for good reason. Taken together, the totality of these circumstances indicate that the indictment of this defendant was not an exercise of the evenhanded judgment of a disinterested prosecutor, acting free from personal bias, partisan animus, or divided loyalties—as is required by the Constitution and the Department

---

[5] Reports indicate that the President may have intended this post to be a private message for the Attorney General, which he accidentally posted publicly. *See, e.g.,* Kristen Welker & Rebecca Shabad, *Trump Accidentally Posted Message Pressuring Pam Bondi to Charge His Enemies, Source Says,* NBC NEWS (Oct. 10, 2025), https://www.nbcnews.com/news/amp/rcna236830.

[6] Donald J. Trump (@realDonaldTrump), *Pam: I have reviewed . . . ,* TRUTH SOCIAL (Sept. 20, 2025, 6:44 pm), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727; *see* Jeremy Roebuck, Perry Stein, & Salvador Rizzo, *Trump Demands Bondi Prosecute Political Foes in Truth Social Posts,* WASHINGTON POST (updated Sept. 20, 2025), https://www.washingtonpost.com/national-security/2025/09/20/replacement-named-va-prosecutor-ousted-over-probes-trump-foes/.

[7] *See* Dan Mangan & Kevin Breuninger, *Letitia James Indicted After Trump Called for Charges Against New York AG,* CNBC (updated Oct. 10, 2025), https://www.cnbc.com/amp/2025/10/09/trump-letitia-james-halligan-mortgage.html.

[8] Scott MacFarlane, *Trump Admin. Fires 2 Prosecutors Who Opposed Charges Against N.Y. Attorney General Letitia James, Source Says,* CBS NEWS (Oct. 20, 2025), https://www.cbsnews.com/amp/news/trump-admin-fires-2-prosecutors-opposed-letitia-james-charges/.

4

of Justice's formal policies. Instead, it represented an act of personal retribution by the President, acting through a United States Attorney whom he had just recently selected and installed.

The Due Process Clause forbids vindictive and targeted prosecutions of just this kind. Courts have long held that "[t]o punish a person" with criminal charges for doing something that "the law plainly allows him [or her] to do"—which can include exercising the constitutional right to speak publicly as a private citizen and fulfilling statutory duties as a public official—is "a due process violation of the most basic sort." *Bordenkircher v. Hayes*, 434 U.S. 357, 363 (1978). Likewise, "[i]t is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion," *Young v. United States ex rel. Vuitton et Fils S.A.,* 481 U.S. 787, 810 (1987), because "the criminal defendant is entitled to an impartial prosecutor," *Jones v. Richards*, 776 F.2d 1244, 1247 (4th Cir. 1985). In a case where a federal prosecution fails to abide by these basic principles, it falls to courts like this one to intervene and protect the defendant's fundamental constitutional rights.

Amici recognize that motions to dismiss indictments on due process grounds must appropriately clear a high bar. In the mine run of cases, such motions frequently fail to support an inference of actual animus. But this case presents the extraordinary circumstance where unconstitutionally retributive animus and personally targeted prosecution are apparent from the public record. Allowing this indictment to stand, under these circumstances, would violate core constitutional protections, invite further dangerous abuses of prosecutorial power, and ultimately undermine the values of fair-minded and equal justice under law that the Department of Justice is meant to protect.

## ARGUMENT

I.    **The Department of Justice's longstanding policies are designed to ensure that criminal prosecutions are impartial and fundamentally fair.**

Federal prosecutors have broad powers to both investigate and prosecute crimes: They investigate allegations of criminal wrongdoing, initiate charges through informations and grand jury indictments, seek verdicts at trial or admissions of guilt through plea negotiations, recommend sentences, and defend convictions on appeal. Federal prosecutors are appropriately entrusted with broad discretion in exercising their authority. But in so doing, prosecutors must abide by fundamental constitutional principles, chief among them that no person be subject to a biased, targeted, or vindictive prosecution.

Several resources assist prosecutors in their efforts to uphold that fundamental constitutional obligation, including written policies issued by the Department of Justice setting forth the general principles of federal prosecution and outlining ethical considerations for prosecutors; professional conduct rules specific to prosecutors; longstanding Department norms on the role of the prosecutor; and established practices and procedures designed to ensure fair and impartial prosecutions. Collectively, these safeguards protect the constitutional rights of criminal defendants and promote public respect for the Department and the criminal justice system as a whole.

A.    As former senior officials who led the Department of Justice and its components, Amici "fully appreciate the vast power and immense discretion that are placed in the hands of a prosecutor." *Morrison v. Olson*, 487 U.S. 654, 727 (1988) (Scalia, J., dissenting). Prosecutors decide how "to enforce the Nation's criminal laws." *United States v. Armstrong*, 517 U.S. 456, 464 (1996). "Whether to prosecute and what charge to file or bring before a grand jury are decisions that generally rest in the prosecutor's discretion" alone. *United States v. Batchelder*, 442

U.S. 114, 124 (1979). The prosecutor's "mere institution of proceedings" through an indictment or information has grave consequences for the "reputation or liberty of a man" and can cause potentially "incalculable" "harm to property and business." *Ewing v. Mytinger & Casselberry*, 339 U.S. 594, 599 (1950). More than 80 years ago, then-Attorney General Robert H. Jackson warned that "[t]he prosecutor has more control over life, liberty, and reputation than any other person in America." Robert H. Jackson, Attorney General of the United States, *The Federal Prosecutor*, at 1, Address Delivered at the Second Annual Conference of United States Attorneys (Apr. 1, 1940), https://www.justice.gov/sites/default/files/ag/legacy/2011/09/16/04-01-1940.pdf.

That power comes with attendant responsibilities for prosecutors to exercise their authority in a scrupulously fair and ethical manner. Indeed, federal prosecutors wield the powers that they possess not as "an ordinary party to a controversy," but instead as a "representative" of "a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all." *Berger v. United States*, 295 U.S. 78, 88 (1935). In that role, prosecutors seek not merely to "win a case"; their efforts, including prosecuting "with earnestness and vigor," and "strik[ing] hard blows" but not "foul ones," aim foremost to ensure that "justice shall be done." *Id.*; *accord* Jackson, *supra*, at 3 ("Although the government technically loses its case, it has really won if justice has been done."). A critical component in seeking justice is the principle that prosecutions always be based on "law and merit, and not on considerations of party affiliation, political image-making, or White House approval or influence." *Removing Politics from the Administration of Justice: Hearings on S. 2803 and S. 2978 Before the S. Comm. on the Judiciary*, 93rd Cong. 202, at 16 (1974) (statement of Hon. Theodore Sorenson); *see* Andrew Kent, *Congress and the Independence of Federal Law Enforcement*, 52 U.C. Davis L. Rev. 1927, 1934 (2019) ("Partisan political considerations, personal vendettas or favoritism, financial gain, or self-protection or self-

7

dealing should play no role in investigating or prosecuting cases, [or in] hiring or firing career officials, prosecutors, and law enforcement agents, and U.S. Attorneys and FBI Directors."). That principle requires prosecutors, when assessing whether to open an investigation or pursue criminal charges, to maintain "a detached and impartial view of all groups in [their] community." Jackson, *supra*, at 4.

**B.**    The Department of Justice relies on formal policies, long-accepted norms, and established practices to ensure that federal prosecutors fulfill their obligations to seek justice and uphold the Constitution to which they each swore an oath. As Amici know first-hand from their time in public service, the Department's policies are designed to ensure that prosecutions are supported by the evidence and are motivated by the unbiased pursuit of justice. Underlying those policies is the deeply rooted constitutional value that prosecutions must not be driven improperly by personal, partisan, or retributive animus toward any defendant. And well-established Department procedures and processes, including multiple levels of review before a grand jury indictment is sought, guard against improper prosecutions.

1.    Start with the Department's policies governing federal prosecution. Any Department attorney's starting point when approaching a potential prosecution are the Principles of Federal Prosecution outlined in the Justice Manual. Dep't of Justice, Justice Manual, § 9-27.000 *et seq.* ("Principles").[9]    A statement of "prosecutorial policies and practices" grounded in constitutional values and "the fundamental interests of society," the Principles seek to "promote the reasoned exercise of prosecutorial authority and contribute to the fair, evenhanded

_____

[9] The Justice Manual "publicly sets forth" the Department's "policies and procedures," Justice Manual, § 1-1.100, is "prepared under the supervision of the Attorney General and direction of the Deputy Attorney General," *id.* § 1-1.200, and "contains internal Department guidance that has been adopted through a policy-development process," *id.* § 1-1.300.

administration of the federal criminal laws." *Id.* § 9-27.001. Recognizing that "federal prosecutors have great latitude in making crucial decisions concerning enforcement of a nationwide system of criminal justice," the Principles "summarize[] appropriate considerations to be weighed" and "desirable practices" that Department of Justice attorneys should follow when "discharging their prosecutorial responsibilities." *Id.* § 9-27.110, cmt. That the Principles are publicly available, moreover, "ensur[es] the fair and effective exercise of prosecutorial discretion and responsibility by attorneys for the government" and "promot[es] confidence on the part of the public and individual defendants that important prosecutorial decisions will be made rationally and objectively based on an individualized assessment of the facts and circumstances of each case." *Id.* § 9-27.001.

The Principles articulate the appropriate grounds for initiating a federal prosecution. Once a federal prosecutor has concluded that there is probable cause that a person has committed a federal offense, *see Branzburg v. Hayes*, 408 U.S. 665, 686 (1972) (grand jury indictment requires probable cause), the prosecutor must determine whether federal prosecution is warranted, Justice Manual, § 9-27.200. But probable cause is not enough: there is a "longstanding threshold requirement . . . that a prosecutor may commence or recommend federal prosecution only if he/she believes that the person will more likely than not be found guilty beyond a reasonable doubt by an unbiased trier of fact and that the conviction will be upheld on appeal." *Id.* § 9-27.220, cmt. A prosecutor also should not bring a case where: "(1) the prosecution would serve no substantial federal interest; (2) the person is subject to effective prosecution in another jurisdiction; or (3) there exists an adequate non-criminal alternative to prosecution." *Id.* § 9-27.220. Each of those factors, in turn, requires distinct analysis that the Principles discuss in detail. *See id.* § 9-27.230 (identifying nine considerations the prosecutor should weigh in assessing whether the prosecution

9

would serve a substantial federal interest); *id.* § 9-27.240 (identifying three considerations the prosecutor should weigh in assessing whether the person is subject to effective prosecution in another jurisdiction); *id.* § 9-27.250 (identifying four considerations the prosecutor should weigh in assessing whether there exist any adequate, non-criminal alternatives to prosecution).

Equally, or perhaps even more, important is the Principles' directive on what constitute "[i]mpermissible [c]onsiderations" for a prosecutor determining whether to initiate prosecution. *Id.* § 9-27.260. A prosecutor "may not be influenced by," among other things, the person's "political association, activities, or beliefs," *id.* § 9-27.260(1), the prosecutor's "own personal feelings concerning the person," *id.* § 9-27.260(2), or "the possible effect of the decision" on the prosecutor's "own professional or personal circumstances," *id.* § 9-27.260(3). This provision in the Principles thus ensures that prosecution is not based on "an unjustifiable standard such as race, religion, or other arbitrary classification," *Oyler v. Boles*, 368 U.S. 448, 456 (1962), and ultimately undergirds the "presumption of regularity"—*i.e.*, that prosecutors "have properly discharged their official duties . . . in the absence of clear evidence to the contrary"—that is typically accorded to prosecutorial decisions. *Armstrong*, 517 U.S. at 464 (quoting *United States v. Chem. Found., Inc.*, 272 U.S. 1, 14-15 (1967)).

In addition to the Principles, the Department of Justice also promulgates an Ethics Handbook that guides prosecutorial conduct and decision-making. *See* Dep't of Justice, Ethics Handbook for On and Off-Duty Conduct (Nov. 2024), https://www.justice.gov/jmd/ethics/ethics-handbook ("Handbook"). The Handbook calls attention to fourteen principles applicable to federal prosecutors (and all federal employees) to ensure that "their conduct is proper." 5 C.F.R. § 2635.101(b); *see* § 2635.101(b)(8) (mandating that all federal employees, including prosecutors, "act impartially"). It further summarizes the relevant conflict of interest statutes (18 U.S.C.

10

§§ 202-209), the Uniform Standards of Ethical Conduct for Employees of the Executive Branch, (5 C.F.R. part 2635), supplemental Department of Justice-specific regulations (5 C.F.R. part 3801), and Executive Branch-wide standards of conduct (5 U.S.C. § 735). Taken together, these rules and regulations aim at safeguarding against actual or apparent conflicts of interest and any other appearance of impropriety by Department employees.

The ethical guidance issued through the Handbook stands alongside rules of professional conduct that further ensure the impartial administration of criminal justice. For example, the provision in the Model Rules of Professional Conduct focused on the "Special Responsibilities of a Prosecutor" directs prosecutors to refrain "from prosecuting a charge that the prosecutor knows is not supported by probable cause" and "from making [or allowing others associated with the prosecutor to make] extrajudicial comments that have a substantial likelihood of heightening public condemnation of the accused." Am. Bar Ass'n, Model Rules of Prof. Conduct, R. 3.8(a), (f). State ethical rules impose materially identical obligations. *See, e.g.,* Va. Rules of Prof. Conduct, R. 3.8 & cmt. 1 ("A prosecutor has the responsibility of a minister of justice and not simply that of an advocate."); Fla. Rules of Prof. Conduct, R. 4-3.8 & cmt. (same).

2.      The policies announced in the Principles and Handbook rest on a deeper substrate of norms about federal prosecutors, articulated most succinctly by then-Attorney General Jackson in his famous speech to a gathering of United States Attorneys. Jackson recognized the "tremendous" power and discretion that prosecutors wield, observing that, in the wrong hands, abuses could follow: "He can have citizens investigated and, if he is that kind of person, he can have this done to the tune of public statements and veiled or unveiled intimation." Jackson, *supra*, at 1. Those abuses might culminate in "the most dangerous power of the prosecutor: that he will pick people that he thinks he should get, rather than pick cases that need to be prosecuted." *Id.* at

4. That concern was greatest, Jackson worried, "[i]n times of fear or hysteria," where a person may be targeted for "being unpopular with the predominant or governing group, being attached to the wrong political views, or being personally obnoxious to or in the way of the prosecutor himself." *Id.* at 5. Jackson urged the United States Attorneys assembled for his remarks not to "forget that it was not so long ago that both the term 'Republican' and the term 'Democrat' were epithets with sinister meaning to denote persons of radical tendencies that were 'subversive' of the order of things then dominant." *Id.* at 5-6.

Wary of the grave dangers ill-used prosecutorial power could present, Jackson identified the "spirit of fair play and decency" that must "animate the federal prosecutor" and that safeguards against overzealous or retributive prosecutions. *Id.* at 3. At bottom, Jackson recognized, the "citizen's safety lies in the prosecutor who tempers zeal with human kindness, who seeks truth and not victims, who serves the law and not factional purposes, and who approaches his task with humility." *Id.* at 7. Jackson's speech thus reminds Department attorneys of the awesome power they wield and the manner in which they must wield it to serve properly as "one of the most beneficent forces in our society." *Id.* at 1.

3. The Department implements the policies and norms described above through regular practices and procedures. The Principles require U.S. Attorneys and Assistant Attorneys General to "establish internal procedures" so that "prosecutorial decisions are made at an appropriate level of responsibility" and consistent with the Principles. Justice Manual, § 9-27.130(1). Those procedures—aimed at "regularizing the decision-making process"—should also ensure that "serious, unjustified departures" from the Principles are met with appropriate "remedial measures," including disciplinary sanctions. *Id.* § 9-27.130(2), cmt. The Principles also encourage

senior Department officials to "establish internal procedures for appropriate review and documentation of decisions." *Id.* § 9-27.130, cmt.

Specific procedures vary among different U.S. Attorney's Offices and Justice Department litigating components, but the core practices are familiar to every federal prosecutor. For a case such as this one, prosecutors would typically work closely with agents or law enforcement officers to conduct a thorough and comprehensive investigation before deciding whether criminal charges are merited. *See id.* § 9-27.200(1). As the investigation closes, prosecutors would draft a memorandum analyzing whether the facts uncovered through the investigation meet the elements of any applicable federal offenses, and if so, whether any factual or legal defenses might pose an obstacle to securing a conviction. Where the recommendation is to initiate charges, the analysis typically comprises the prosecutor's prosecution memorandum. *See, e.g.,* Dep't of Justice, Criminal Resource Manual, § 2073 (1997), https://www.justice.gov/archives/jm/criminal-resource-manual-2073-rico-prosecution-memorandum-general-requirements (providing that a prosecution memorandum must "be an accurate, candid, and thorough analysis of the strengths and weaknesses of the proposed prosecution" and providing topics the memorandum should address).[10] If, by contrast, the prosecutor conducts a full investigation but ultimately concludes that prosecution is not merited, the resulting analysis becomes a declination memorandum, which in some cases may be made public. *See* Justice Manual, § 9-27.270 (requiring prosecutors to communicate reasons for a declination to the "investigating agency" and to ensure "an adequate record" of the declination exists); *see also* Jessica A. Roth, *Prosecutorial Declination Statements,* 110 J. Crim. & Criminology 477, 490 (2020) (noting that declination statements advance several

---

[10] The Criminal Resource Manual was last published in 1997, *see United States v. Caldwell,* 581 F. Supp. 3d 1, 14 (D.D.C. 2021), and has been supplanted by the Justice Manual. Nonetheless, its description accurately reflects the appropriate contents of a prosecution memorandum.

"signaling interests," including "closure to those most immediately affected by a declination decision"; "respect to prosecutors' fellow institutional actors such as law enforcement agencies and legislators"; "nudges about the need for reforms"; "educational signals to the public about criminal law"; and "signals about the prosecutorial role").

The line prosecutor's recommendation to prosecute or decline a case is not the end of the matter. Consistent with the Principles' commitment that prosecutorial decisions happen "at an appropriate level of responsibility," Justice Manual, § 9-27.130, the prosecutor would expect to confer at a minimum with an immediate supervisor. In many cases, further review from higher level supervisors (such as the section chief, the criminal chief, and the U.S. Attorney in a U.S. Attorney's Office or the section chief, Deputy Assistant Attorney General, and Assistant Attorney General within Main Justice) would ensue. And for certain types of cases or certain investigative steps, prosecutors must consult or obtain approval of components within the Justice Department before initiating charges. *See, e.g., id.* § 9-90.020(B) (prosecuting a case involving certain national security statutes requires the "express approval" of the National Security Division); *see also id.* § 9-13.400(3)(A) (generally requiring Attorney General approval "before the issuance of any subpoena to a member of the news media"); *see also id.* § 9-85.210 (although this requirement appears to have been recently suspended, consultation with the Public Integrity Section was formerly required for any "federal criminal matter that involves alleged or suspected violations of federal or state campaign financing laws, federal patronage crimes, or corruption of the election process"). Supervisory review then continues post-indictment and throughout the life of the prosecution, particularly in cases of national prominence.

C.    Collectively, these Department policies and practices are aimed at ensuring the neutral, merits-based application of criminal law. *See* Justice Manual § 9-27.001 (noting that the

14

Principles seek to "contribute to the fair, evenhanded administration of the federal criminal laws"). Although the Department's internal policies do not themselves create enforceable substantive rights for criminal defendants, *see id.* § 9-27.150, they reflect the Department's efforts to protect the underlying constitutional rights of defendants—including the critical due process right against vindictive and self-interested prosecution, discussed below. Moreover, the Department has chosen to make the Principles, Handbook, and other internal policies public, to promote public respect and confidence in the Department's work—a logic that holds only when the Department and its prosecutors adhere to the guiding lights in those documents.

As former senior officials of the Justice Department, Amici were bound by these prosecutorial principles and ethical rules during their public service. Amici continue to regard them as critical safeguards of democracy, due process, and the rule of law. As the representative of the People of the United States, the Department must take seriously its solemn responsibility to prosecute crimes in the public interest, not to target for retribution individuals who happen to have incurred the personal wrath of the President, the prosecutor, or anyone else in the Executive Branch.

## II.    Vindictively motivated and biased prosecutions violate not only the Department's obligation to pursue justice, but also the Constitution's guarantee of due process.

These Departmental policies and procedures are not simply a reflection of the Department's own internal commitment to pursue justice. They are also a cornerstone of the agency's efforts to safeguard critical constitutional protections, including criminal defendants' rights to due process. The Constitution's protection against "depriv[ation] of life, liberty or property without due process of law," U.S. Const. amend. V, encompasses notions of "fundamental fairness" in criminal proceedings, including the "exercise [of] fairminded judgment" by prosecutors. *Ganger v. Peyton*, 379 F.2d 709, 713-14 (4th Cir. 1967). Several closely related lines

15

of legal authority thus collectively hold that vindictively motivated and personally biased prosecutions violate the Due Process Clause.

**A.    The Due Process Clause forbids vindictive prosecutions that are motivated by retributive animus.**

First, courts have routinely, and rightly, recognized that vindictive prosecutions based on retributive animus—that is, prosecutions that are intended "[t]o punish a person because he has done what the law plainly allows him to do"—are "a due process violation of the most basic sort." *Bordenkircher*, 434 U.S. at 363. "[A] prosecution brought with vindictive motive . . . 'would be patently unconstitutional.'" *United States v. Sanders*, 211 F.3d 711, 716 (2d Cir. 2000) (quoting *North Carolina v. Pearce*, 395 U.S. 711, 724 (1969), *overruled on other grounds by Alabama v. Smith*, 490 U.S. 794 (1989)). Such retributive prosecutions can "ha[ve] no place in our system of justice." *United States v. Ball*, 18 F.4th 445, 454 (4th Cir. 2021).

To be sure, the cases addressing vindictive prosecution claims typically arise under a somewhat different factual scenario than the one presented here. In this case, the President called for the prosecution of specific individuals, installed a new United States Attorney after the prior United States Attorney apparently declined to pursue those charges, and contemporaneously messaged the Attorney General via social media to effectively direct the indictment of the desired cases. That situation is so unusual that there is no precedent directly addressing it. Instead, the vast majority of the prosecutorial vindictiveness cases arise out of the far more common fact pattern where, in the absence of any direct proof of vindictive animus, a defendant asks a court to infer vindictiveness because he has been subjected to heightened charges or a harsher sentence after exercising a constitutionally protected right, such as the right to trial or to an appeal. *See, e.g.*, *Blackledge v. Perry*, 417 U.S. 21, 28 (1974) (finding unconstitutional vindictiveness when a state prosecutor increased charges from a misdemeanor to a felony following defendant's exercise

16

of "his statutory right to a trial de novo"); *United States v. Mosley*, 64 F.3d 907, 920 (4th Cir. 1995) (addressing but rejecting defendant's claim that the government's seeking an enhanced sentence was "retaliatory conduct . . . designed to punish him for exercising his right to trial by jury").

But although the events in this case are unprecedented, the relevant legal precedent supports the conclusion that a constitutional violation has occurred here. The vindictive prosecution case law collectively reflects a broad animating principle that it is a violation of due process for a defendant to be prosecuted solely in retaliation for the "exercise of a protected legal right," *United States v. Goodwin*, 457 U.S. 368, 380 n.11 (1982), or for doing anything else (such as speaking publicly as a private citizen or carrying out one's duties as a public official) that "the law plainly allows [her] to do," *Bordenkircher*, 434 U.S. at 363—not simply for invoking criminal-defense-specific constitutional rights. *Bordenkircher*'s broad language accords with that interpretation, as does language in other cases analyzing whether a defendant has adequately proven "genuine animus" on the part of the prosecutor, *see, e.g., United States v. Wilson*, 262 F.3d 305, 314 (4th Cir. 2001); *United States v. Myung S. Koh*, 199 F.3d 632, 640 (2d Cir. 1999). Moreover, many courts have entertained motions to dismiss indictments for alleged vindictiveness in retaliation for First Amendment-protected speech. *See, e.g., United States v. Bucci*, 582 F.3d 108, 113-14 (1st Cir. 2009); *Sanders*, 211 F.3d at 718; *United States v. P.H.E., Inc.*, 965 F.2d 848, 860 (10th Cir. 1992).

The Supreme Court and the Fourth Circuit have also extended the vindictiveness doctrine even to invocations of non-constitutional statutory rights. *See Pearce*, 395 U.S. at 724 ("[T]he imposition of a penalty upon the defendant for having successfully pursued a statutory right . . . would be no less a violation of due process of law."); *see also United States v. Fiel*, 35 F.3d 997, 1007 (4th Cir. 1994) ("A defendant may not be punished for exercising a protected statutory or

17

constitutional right."). And another district court recently found sufficient evidence of vindictiveness to warrant discovery based on criminal charges brought in apparent retaliation for the defendant's filing a civil lawsuit against the government. *United States v. Abrego Garcia*, No. 3:25-cr-00115, -- F. Supp. 3d --, 2025 WL 2814712 (M.D. Tenn. Oct. 3, 2025).

Taken as a whole, therefore, the overall thrust of this anti-vindictiveness doctrine is aimed at protecting defendants' due process rights by ensuring that criminal charges are brought as a reasoned exercise of prosecutorial power, not motivated by the government's improper desire for retribution.

### B. The Due Process Clause requires an impartial prosecutor, free from bias or conflicts of interest.

Another longstanding line of authorities similarly holds that due process requires prosecutors to be impartial and "disinterested," and to operate free from personal bias or conflicts of interest. "It is a fundamental premise of our society that the state wield its formidable criminal enforcement powers in a rigorously disinterested fashion." *Young*, 481 U.S. at 810. The Supreme Court in *Young* recognized the "distinctive role" and unique responsibilities of the federal prosecutor, who must act as "'the representative not of an ordinary party to a controversy, but of a sovereignty whose obligation to govern impartially is as compelling as its obligation to govern at all; and whose interest, therefore, in a criminal prosecution is not that it shall win a case, but that justice shall be done.'" *Id.* at 802-03 (quoting *Berger*, 295 U.S. at 88); *see also id.* (citing ethical rules for prosecutors providing that "[t]he responsibility of a public prosecutor differs from that of the usual advocate; his duty is to seek justice, not merely to convict"). The *Young* Court therefore held that an attorney with a conflict of interest could not prosecute a criminal contempt case, reasoning that the attorney would be "serv[ing] two masters" and thus could not "be guided solely by their sense of public responsibility for the attainment of justice." *Id.* at 814. When a prosecutor

18

is "subject to influences that undermine confidence that a prosecution can be conducted in [a] disinterested fashion," the Court explained, "we cannot have confidence in a proceeding in which this officer plays the critical role of preparing and presenting the case for the defendant's guilt." *Id.* at 811.

The Fourth Circuit has also recognized that a criminal prosecution cannot be constitutionally valid when the "prosecuting attorney's own self-interest" or conflicting obligation to a third party precludes him from "exercis[ing] fairminded judgment" as a prosecutor. *Ganger*, 379 F.2d at 713-14. In *Ganger*, the court found a violation of "the requirement of fundamental fairness assured by the Due Process Clause" when a prosecutor had an obvious conflict of interest. *Id.* at 714 (explaining that the state prosecutor in the domestic violence prosecution had simultaneously represented the defendant's wife in divorce proceedings based on the same alleged assault). The court emphasized that "[t]he prosecuting attorney is an officer of the court" who has been "vested with a vast quantum of discretion." *Id.* (quoting *Bauers v. Heisel*, 361 F.2d 581, 590 (3d Cir. 1966)). But that "authority carries with it a commensurate responsibility" to prosecute in an impartial and disinterested fashion. *Id.* at 713 (quotation omitted). As the Fourth Circuit later put it, "[t]he thrust of *Ganger* is that the criminal defendant is entitled to an impartial prosecutor." *Jones*, 776 F.2d at 1247 (explaining that a prosecutor must be free to "make an unbiased use" of the powers of the prosecutor's office).

\* \* \*

These conflict-of-interest cases, particularly when read alongside the vindictive prosecution precedent already discussed, point to a broader due process right to be free from improperly motivated or unlawfully targeted prosecutions. Taken together, the cases stand for the uncontroversial proposition that criminal defendants—and the criminal justice system as a

19

whole—are entitled to unbiased prosecutors, who bring charges based on a neutral evaluation of the facts and the law, and who act free from vindictive animus or other personally self-interested calculations.

**III.    As a product of vindictive animus, rather than the fair-minded judgment of an impartial prosecutor, this indictment does not comport with the Due Process Clause.**

Judged against those standards, it is difficult to imagine a more obvious example of an indictment that runs afoul of the Due Process Clause. Indeed, this indictment marks a dangerous abuse of the Department of Justice's authority that is both unrecognizable and anathema to Amici, as veteran public servants and former Department officials.

**A.**    At the outset, Amici recognize that in a typical criminal case, the standards for pre-trial dismissal of an indictment (or even granting discovery to the defendant) on due process grounds are appropriately high, and such motions are rarely granted. *See Wilson*, 262 F.3d at 315-16 (describing the "rigorous" standards that apply when a defendant alleges prosecutorial vindictiveness, as well as the "significant barrier[s] to discovery"). Amici likewise agree that "courts must . . . be cautious not to intrude unduly in the broad discretion given to prosecutors in making charging decisions." *Id.* at 315. And Amici do not advocate here for any relaxation of those general standards as they typically apply in criminal cases.

**B.**    This case, however, is far from typical. It is not the usual alleged vindictiveness case, where a defendant relies on indirect circumstantial evidence and asks the court "to 'presume' an improper vindictive motive" in an effort to overcome the otherwise-applicable presumption of regularity in criminal indictments. *Goodwin*, 457 U.S. at 373. Those dueling presumptions exist because courts have recognized that in the mine run of criminal cases, prosecutorial "[m]otives are complex and difficult to prove," *id.*, such that inferential methods of discerning motivations are required.

20

But not so here.  Instead, this is the extraordinarily "rare case" where there is direct, objective evidence of "actual vindictiveness." *United States v. Johnson*, 171 F.3d 139, 140-41 (2d Cir. 1999) (quoting *Goodwin*, 457 U.S. at 384 n.19).  And the Fourth Circuit has explained that a defendant can directly prevail on a vindictive prosecution claim, without resort to any of the presumptions, by presenting "objective evidence, that (1) the prosecutor acted with genuine animus toward the defendant and (2) the defendant would not have been prosecuted but for that animus." *United States v. Villa*, 70 F.4th 704, 710 (4th Cir. 2023); *see also Ball*, 18 F.4th at 454; *United States v. Jackson*, 327 F.3d 273, 294 (4th Cir. 2003).  Both prongs of that test are satisfied here.

*First*, the Executive Branch's "genuine animus" toward James is apparent from the public record.  The President has made public statements directing Justice Department officials to prosecute James for having done "what the law plainly allows [her] to do." *Bordenkircher*, 434 U.S. at 363.[11]  Indeed, the President explicitly told the Attorney General that, because "[t]hey impeached me twice, and indicted me (5 times!)," "JUSTICE" against James (along with several others) "MUST BE SERVED, NOW!!!"[12] *See also* Dkt. 53 (James Motion to Dismiss) at 5-10, 15-18, 25-28 & Dkt. 53-1 (Ex. A) (chronicling years of public statements that the President has made expressing animus toward James and calling for her prosecution).  Those direct statements are tantamount to an "actual confession" of retributive animus. *United States v. Andrews*, 633

---

[11] This is true whether the animus is framed as retribution for First Amendment-protected speech that James made as a private citizen or while campaigning for office, *cf. Nat'l Rifle Ass'n v. Vullo*, 602 U.S. 175, 188 (2024) (noting that a government official cannot "use the power of the State to punish or suppress disfavored expression"), or as retaliation against her for exercising her statutory authority as New York's Attorney General, *see, e.g.*, N.Y. Exec. Law § 63.

[12] Donald J. Trump (@realDonaldTrump), *Pam: I have reviewed . . . .* TRUTH SOCIAL (Sept. 20, 2025, 6:44 pm), https://truthsocial.com/@realDonaldTrump/posts/115239044548033727.

F.2d 449, 453 (6th Cir. 1980); *see also Johnson*, 171 F.3d at 141 ("direct evidence" of vindictiveness can include "a statement by the prosecutor"); *United States v. Velsicol Chem. Corp.*, 498 F. Supp. 1255, 1266 (D.D.C. 1980) (finding actual vindictiveness and dismissing indictments where the U.S. Attorney "clearly expressed his intent and motivation" for bringing charges).

The objective evidence also indicates that that retributive motivation was the direct catalyst for this prosecution. The animus can thus be imputed directly from the President to Halligan[13]—who was appointed just weeks before she personally presented this indictment to the grand jury (itself highly unusual for a U.S. Attorney in this District), and who of course serves at the President's pleasure, *see* 28 U.S.C. § 541(c) ("Each United States attorney is subject to removal by the President."). In other words. Halligan was "prevailed upon to bring the charges by another [*i.e.*, the President, as head of the Executive Branch] such that she could be considered a 'stalking horse'" for the President's evident retributive animus. *Koh*. 199 F.3d at 640 (internal citation and quotation marks omitted).[14]

*Second*, the evidence indicates that absent that genuine animus emanating from the head of the Executive Branch, this defendant would not otherwise have been indicted. The United States Attorney who immediately preceded Halligan. Erik Siebert, had apparently opposed bringing charges after receiving a declination memorandum from career prosecutors outlining concerns

---

[13] Halligan was also explicitly mentioned in the President's social media post to the Attorney General. where the President wrote: "Lindsey Halligan is a really good lawyer. and likes you. a lot. We can't delay any longer, it's killing our reputation and credibility." *Id.*

[14] The Fourth Circuit has previously expressed reluctance to "impute the improper motivation" from one prosecutor to another, at least where the prosecutor who ultimately charged the case was unaware of the referring prosecutor's vindictive animus. *See, e.g.. Wilson*, 262 F.3d at 319-20. But that hesitation has no place here, where the President has made no effort to hide his animus.

about the case's viability.[15]  Moreover, no career prosecutor from the U.S. Attorney's Office for this District signed the indictment in this case; Halligan was sole signatory, *see* Dkt. 1 (Indictment), and she also apparently presented that indictment to the grand jury alone, with no one else from the office accompanying her.[16]  It appears that it was therefore the President's direct intervention in this case—removing Siebert and installing Halligan, and then publicly directing that "JUSTICE MUST BE SERVED" against the defendant—that secured this indictment.  Meanwhile, every indication is that but for that retributively motivated intervention, the indictment would never even have been presented to a grand jury.

      **C.**     The Due Process Clause forbids such a vindictive and personally motivated exercise of prosecutorial authority.  The use of a criminal indictment to "SERVE[] . . . JUSTICE" against personal or partisan opponents contravenes not just well-settled Departmental policies and relevant ethics rules.  *See supra* at pp. 6-15.  It also runs afoul of the "fundamental premise" that the government must "wield its formidable criminal enforcement powers in a rigorously disinterested fashion." *Young*, 481 U.S. at 810.

      The United States Attorney in this District cannot ethically or constitutionally "serve two masters," *Ganger*, 379 F.2d at 714: (1) the Constitution and People of the United States, and (2) the President's publicly avowed desire for revenge on a specific defendant.  But the objective evidence suggests that the latter is what occurred here: the President (operating through the newly installed interim United States Attorney) "pick[ed]" a person "he thinks he should get" and prevailed upon

---

[15] *See* Katherine Faulders, et al., *Evidence Appears to Undercut Claims Against Letitia James, Prosecutors Found: Sources*, ABC NEWS (Oct. 23, 2025), https://abcnews.go.com/amp/US/evidence-appears-undercut-claims-letitia-james-prosecutors-found/story?id=126723989.

[16] *See* Anna Bower, *Anna, Lindsey Halligan Here*, LAWFARE (Oct. 20, 2025), https://www.lawfaremedia.org/article/anna--lindsey-halligan-here (publishing a message in which Halligan stated that she was "the one handling" the James case before the grand jury).

the United States Attorney to charge her, all because that person was "personally obnoxious to or in the way of the [President] himself." Jackson, *supra* at 4-5. The President's many public statements strongly indicate that this prosecution has been driven by the defendant's "political association, activities, or beliefs," and by the President's "own personal feelings concerning" the defendant. Justice Manual, § 9-27.260. A conflicted prosecution of that sort is anathema not only to the Department's policies and norms; it also fails to embody the exercise of "fairminded" prosecutorial judgment, *Ganger*, 379 F.2d at 713, that the Due Process Clause requires.[17]

That the bias in this case traces back to the President, rather than emanating solely from Halligan herself, in no way lessens the constitutional harm caused by the conflict of interest. A prosecutor directed by the head of the Executive Branch to target a specific person—notwithstanding significant evidence showing that that direction was driven by improper animus—cannot but be "subject to influences that undermine confidence that a prosecution can be conducted in [a] disinterested fashion." *Young*, 481 U.S. at 811; *see also Jones*, 776 F.2d at 1247 (noting that the prosecutor must be in a position to "make an unbiased use" of charging authority). And that, in turn, undermines public and judicial confidence in any proceeding in which that prosecutor "plays the critical role of preparing and presenting the case for the defendant's guilt." *Young*, 481 U.S. at 811.

---

[17] Whatever the scope of the President's constitutional authority to direct federal prosecutions under Article II—a matter that the Court need not resolve in this case—a vindictively motivated prosecution does not further the President's constitutional obligation to "take Care that the Laws be faithfully executed," U.S. Const. art. II, § 3, because faithful execution of the law requires neutral and impartial prosecutions.

24

IV.    **Relief is merited in this case and will deter any similar future abuses of prosecutorial power.**

Faced with such direct evidence of a retributively motivated prosecution, this Court is empowered to grant the relief requested in the defendant's motion, up to and including outright dismissal of the indictment. *See, e.g., United States v. Jenkins*, 504 F.3d 694, 697, 702 (9th Cir. 2007). The Court may also order discovery if it deems that necessary. *See Wilson*, 262 F.3d at 315; *see also, e.g., United States v. Adams*, 870 F.2d 1140, 1145-46 (6th Cir. 1989).

As the Court evaluates the defendant's motion, however, Amici believe it is critical to underscore that the stakes in this case are not simply about this one indictment, or this specific defendant. Indeed, this is not even the only vindictively motivated indictment brought in this District in recent weeks: one of the other targets mentioned by name in the President's September 20, 2025 social media post, former FBI Director James Comey, was also recently indicted in this District, in an indictment also signed and personally presented by Halligan. *See United States v. James B. Comey, Jr.*, No. 1:25-CR-272, Dkt. 1 (Indictment) (E.D. Va.) (Sept. 25, 2025). And in the wake of that Comey indictment, the President explicitly promised in televised remarks that "there will be others."[18]

Accordingly, although this case may present one of the first tests, whatever this Court rules here will carry far broader implications—not only for other similarly situated defendants, but also for the rule of law and free society in this Nation more broadly. If this kind of vindictively targeted indictment is allowed to stand, it would send a dangerous signal, short-circuiting whatever internal guardrails remain within the Department, and emboldening the government to target others in exactly the way that then-Attorney General Jackson feared: for "being personally obnoxious to or

---

[18] *Watch: Trump Says 'There Will Be Others' After Comey Indictment*, BBC NEWS (Sept. 26, 2025), https://www.bbc.com/news/videos/ceq2zzp1dx2o.

in the way of" the Executive Branch. Jackson, *supra*, at 5. That would carry obvious chilling effects on private citizens` speech and conduct, as well as their basic sense of freedom and security. And it would risk a grave erosion of public confidence in the Department of Justice that is essential for the Department to be able to conduct its vital work.

## CONCLUSION

For the foregoing reasons, the Court should grant defendant James's motion to dismiss the indictment in this case for vindictive prosecution, *see* Dkt. 53.

Respectfully submitted,

*/s/ Gregory P. Rosen*
GREGORY P. ROSEN (VA Bar # 82584)
ROGERS JOSEPH O'DONNELL PC
1500 K Street N.W., Suite 800
Washington, D.C. 20005
(202) 777-8952
grosen@rjo.com

MARY L. DOHRMANN††*
JAMES I. PEARCE†*
WASHINGTON LITIGATION GROUP
1717 K Street N.W., Suite 1120
Washington, D.C. 20006
(202) 521-8750
mdohrmann@washingtonlitigationgroup.org
jpearce@washingtonlitigationgroup.org

† Admitted only in New York and North
Carolina: practicing under the supervision of
D.C. Bar Members
†† Admitted only in New York; practicing
under the supervision of D.C. Bar Members
* Pending motion for admission *pro hac vice*

*Counsel for Amici Curiae*
*Former Senior Officials of the*
*Department of Justice*

## APPENDIX: *AMICI CURIAE*

- A. Brian Albritton, former United States Attorney, Middle District of Florida (2008-2010)

- Kent Alexander, former United States Attorney, Northern District of Georgia (1994-1997)

- Thomas D. Anderson, former Deputy General Counsel, Executive Office for United States Attorneys (2010-2016); former United States Attorney, District of Vermont (2006-2009)

- Brook Andrews, former Acting United States Attorney, District of South Carolina

- Roy L. Austin, Jr., former Deputy Assistant Attorney General, Civil Rights Division (2010-2014)

- Donald B. Ayer, former Deputy Attorney General (1989-1990); former Principal Deputy Solicitor General (1986-1988); former United States Attorney, Eastern District of California (1982-1986)

- Bill Baer, former Acting Associate Attorney General (2016-2017); former Assistant Attorney General, Antitrust Division (2013-2016)

- Samuel R. Bagenstos, former Principal Deputy Assistant Attorney General (2010-2011) and Deputy Assistant Attorney General (2009), Civil Rights Division

- A. Lee Bentley, III, former United States Attorney, Middle District of Florida (2013-2017)

- Daniel G. Bogden, former United States Attorney, District of Nevada (2009-2017; 2001-2007)

- Lanny A. Breuer, former Assistant Attorney General, Criminal Division (2009-2013)

- Beth S. Brinkmann, former Deputy Assistant Attorney General, Civil Division (2009-2016); former Assistant to the Solicitor General (1993-2001)

- Joe B. Brown, former United States Attorney, Middle District of Tennessee (1981-1991)

- Robert C. Bundy, former United States Attorney, District of Alaska (1994-2001)

i

- Ben Burgess, former United States Attorney, District of Kansas (1984-1990)

- A. Bates Butler, III, former United States Attorney, District of Arizona (1980-1981)

- Leslie R. Caldwell, former Assistant Attorney General, Criminal Division (2014-2017)

- Mark T. Calloway, former United States Attorney, Western District of North Carolina (1994-2001); former Director, Executive Office for United States Attorneys (2000-2001)

- Lawrence Cameron, former Acting United States Attorney, Western District of North Carolina

- Robert J. Cleary, former United States Attorney, District of New Jersey (1999-2002); former United States Attorney (interim), Southern District of Illinois (2002)

- Paul Coggins, former United States Attorney, Northern District of Texas (1993-2001)

- Paul Colborn, former Special Counsel, Office of Legal Counsel (1992-2024)

- James M. Cole, former Deputy Attorney General (2011-2015)

- Vincent Connelly, former Head of Special Prosecution Division (1985-1987) and Head of Criminal Division (1983-1985), U.S. Attorney's Office for the Northern District of Illinois

- Clare Connors, former United States Attorney, District of Hawaii (2022-2025)

- Michael W. Cotter, former United States Attorney, District of Montana (2009-2017)

- William B. Cummings, former United States Attorney, Eastern District of Virginia (1975-1979)

- Deirdre M. Daly, former United States Attorney, District of Connecticut (2013-2017)

- Deborah J. Daniels, former Assistant Attorney General, Office of Justice Programs (2001-2005); former United States Attorney, Southern District of Indiana (1988-1993)

- Hampton Dellinger, former Assistant Attorney General, Office of Legal Policy (2021-2023)

- Harry D. Dixon, Jr., former United States Attorney, Southern District of Georgia (1994-2001)

- Edward L. Dowd, Jr., former United States Attorney, Eastern District of Missouri (1993-1999); former Deputy Special Counsel, Waco Investigation (1999-2000)

- John S. Edwards, former United States Attorney, Western District of Virginia (1980-1981)

- Brian Fletcher, former Principal Deputy Solicitor General (2021-2025)

- Andrew L. Frey, former Deputy Solicitor General (1973-1986)

- Kenneth S. Geller, former Deputy Solicitor General (1979-1986); former Assistant Special Prosecutor, Watergate Special Prosecution Force (1973-1975)

- Stuart Gerson, former Acting Attorney General (1993); former Assistant Attorney General, Civil Division (1989-1993)

- Jamie S. Gorelick, former Deputy Attorney General (1994-1997)

- Jamal Greene, former Deputy Assistant Attorney General, Office of Legal Counsel (2023-2024)

- Helaine Greenfeld, former Acting Assistant Attorney General, Legislative Affairs (2021); former Deputy Associate Attorney General (2009-2012)

- Joseph Guerra, former Principal Deputy Associate Attorney General (2009-2010); former Deputy Assistant Attorney General, Office of Legal Counsel (1999-2001)

- Vanita Gupta, former Associate Attorney General (2021-2024)

- Hal H. Hardin, former United States Attorney, Middle District of Tennessee (1977-1981); former Presiding Judge, Nashville Davidson County Court (1976)

- Sarah E. Harrington, former Deputy Assistant Attorney General, Civil Division (2021-2024)

- Rodger A. Heaton, former United States Attorney, Central District of Illinois (2005-2009)

iii

- Eric Holder, Jr., former Attorney General (2009-2015); former United States Attorney, District of Columbia (1993-1997)

- John Horn, former United States Attorney, Northern District of Georgia (2015-2017)

- James T. Jacks, former United States Attorney, Northern District of Texas (2008-2011)

- Michelle L. Jacobs, former Acting United States Attorney (2009), First Assistant United States Attorney and Criminal Chief (2004-2008), Eastern District of Wisconsin

- Marcos Daniel Jiménez, former United States Attorney, Southern District of Florida (2002-2005)

- Dawn Johnsen, former Principal Deputy Assistant Attorney General (2021-2024), Acting Assistant Attorney General (2021; 1997-1998), and Deputy Assistant Attorney General (1993-1996), Office of Legal Counsel

- Brendan V. Johnson, former United States Attorney, District of South Dakota (2009-2015)

- Pamela S. Karlan, former Principal Deputy Assistant Attorney General (2021-2022) and Deputy Assistant Attorney General (2014-2015), Civil Rights Division

- Peter Keisler, former Acting Attorney General (2007); former Assistant Attorney General, Civil Division (2003-2007)

- Todd Kim, former Assistant Attorney General, Environment and Natural Resources Division (2021-2025)

- Wan J. Kim, former Assistant Attorney General, Civil Rights Division (2005-2007)

- Daniel Koffsky, former Deputy Assistant Attorney General (2008-2021) and Acting Assistant Attorney General (1993, 2001), Office of Legal Counsel

- Jesse Laslovich, former United States Attorney, District of Montana (2022-2025)

- Scott Lassar, former United States Attorney, Northern District of Illinois (1997-2001)

- George H. Lowe, former United States Attorney, Northern District of New York (1978-1982); former Magistrate Judge, U.S. District Court for the Northern District of New York (2004-2012)

- J. Michael Luttig, former Assistant Attorney General and Deputy Assistant Attorney General, Office of Legal Counsel (1989-1990); former Counselor to the Attorney General (1990-1991); former Circuit Judge, U.S. Court of Appeals for the Fourth Circuit (1991-2006)

- Daniel Marcus, former Associate Attorney General and Acting Associate Attorney General (1999-2001)

- Stephen R. McAllister, former United States Attorney, District of Kansas (2018-2021)

- Mary B. McCord, former Acting Assistant Attorney General for National Security (2016-2017); former Principal Deputy Assistant Attorney General for National Security (2014-2016)

- A. Melvin McDonald, former United States Attorney, District of Arizona (1981-1985); former Superior Court Judge, Maricopa County Superior Court (1974-1981)

- John McKay, former United States Attorney, Western District of Washington (2001-2007)

- Michael D. McKay, former United States Attorney, Western District of Washington (1989-1993)

- A. Douglas Melamed, former Acting Assistant Attorney General (2000-2001) and Principal Deputy Assistant Attorney General (1996-2000), Antitrust Division

- Gregory R. Miller, former United States Attorney, Northern District of Florida (2002-2008)

- Jan Paul Miller, former United States Attorney, Central District of Illinois (2002-2005)

- Marshall L. Miller, former Principal Associate Deputy Attorney General (2022-2024); former Principal Deputy Assistant Attorney General, Criminal Division (2014-2015)

- Patrick H. Molloy, former United States Attorney, Eastern District of Kentucky (1997-1981); United States Attorney (interim), District of Idaho (1993)

- Robert J. Moossy, Jr., former Deputy Assistant Attorney General, Civil Rights Division (2015-2025)

- Denise E. O'Donnell, former Director, Bureau of Justice Assistance (2011-2017); former United States Attorney, Western District of New York (1997-2001)

- David W. Ogden, former Deputy Attorney General (2009-2010); former Assistant Attorney General, Civil Division (1999-2001)

- Matthew G. Olsen, former Assistant Attorney General for National Security (2021-2025); former Deputy Assistant Attorney General and Counselor to the Attorney General (2006-2010)

- Wendy J. Olson, former United States Attorney, District of Idaho (2010-2017)

- Andrea Sheridan Ordin, former United States Attorney, Central District of California (1977-1981)

- J. Brad Pigott, former United States Attorney, Southern District of Mississippi (1994-2001)

- Ira H. Raphaelson, former Special Counsel, Financial Institutions Crime (1991-1993); former United States Attorney, Northern District of Illinois (1989-1990)

- Gary Restaino, former United States Attorney, District of Arizona (2021-2025); former Acting Director of the Bureau of Alcohol, Tobacco, Firearms, and Explosives (2022)

- Jeannie Rhee, former Deputy Assistant Attorney General, Office of Legal Counsel (2009-2011)

- James G. Richmond, former United States Attorney, Northern District of Indiana (1985-1991)

- Jose de Jesus Rivera, former United States Attorney, District of Arizona (1998-2000)

- Mac Schneider, former United States Attorney, District of North Dakota (2022-2025)

- Christopher Schroeder, former Assistant Attorney General, Office of Legal Counsel (2021-2023); former Assistant Attorney General, Office of Legal Policy (2010-2013)

- Howard M. Shapiro, former General Counsel, Federal Bureau of Investigation (1993-1997)

- Michael D. Skinner, former United States Attorney, Western District of Louisiana (1993-2000)

- Jill E. Steinberg, former United States Attorney, Southern District of Georgia (2023-2025); former Associate Deputy Attorney General, Office of the Deputy Attorney General (2015-2016)

- Frederick W. Thieman, former United States Attorney, Western District of Pennsylvania (1993-1997)

- John Daniel Tinder, former United States Attorney, Southern District of Indiana (1984-1987); former Circuit Judge, U.S. Court of Appeals for the Seventh Circuit (2007-2015); former District Judge, U.S. District Court for the Southern District of Indiana (1987-2007)

- William Michael Treanor, former Deputy Assistant Attorney General, Office of Legal Counsel (1998-2001)

- S. Lane Tucker, former United States Attorney, District of Alaska (2022-2025)

- Stan Twardy, Jr., former United States Attorney, District of Connecticut (1985-1991)

- Benjamin B. Wagner, former United States Attorney, Eastern District of California (2009-2016)

- Seth P. Waxman, former Solicitor General (1997-2001)

- Dan Webb, former United States Attorney, Northern District of Illinois (1981-1985)

- Daniel G. Webber, Jr., former United States Attorney, Western District of Oklahoma (1999-2001)

- William F. Weld, former Assistant Attorney General, Criminal Division (1986-1988); former United States Attorney, District of Massachusetts (1981-1986)

- William D. Wilmoth, former United States Attorney, Northern District of West Virginia (1993-1999)

- Diane P. Wood, former Deputy Assistant Attorney General, Antitrust Division (1993-1995); former Circuit Judge, U.S. Court of Appeals for the Seventh Circuit (1995-2024)

## CERTIFICATE OF SERVICE

I hereby certify that on November 13, 2025, I filed this document in hard copy at the clerk's office and caused a copy of this document to be served by hand-delivery and/or electronic mail (e-mail) upon all counsel of record in this case.

/s/ Gregory P. Rosen
GREGORY P. ROSEN (VA Bar # 82584)
ROGERS JOSEPH O'DONNELL PC
1500 K Street N.W., Suite 800
Washington, D.C. 20005
(202) 777-8952
grosen@rjo.com

viii